CRANFORD INSURANCE CO., INC., a New Jersey corporation, Plaintiff,

v.

ALLWEST INSURANCE COMPANY, a California corporation; Industrial Indemnity Company, a California corporation; Continental Casualty Company, an Illinois corporation; and Allan J. Rosenberg, M.D. an individual and resident of State of California, Defendants.

No. C–85–7316–WWS.

United States District Court, N.D. California.

Oct. 14, 1986.

der a reservation of rights and thereafter defended. In October 1983, Cranford tendered the defense to Industrial, which had issued a personal liability policy to Dr. R., and to Continental, which had issued an umbrella policy. Both rejected the tender.

The action went to trial in November 1984 and was settled on the third day of trial for $77,000, including a contribution from Cranford of $29,999 and from Industrial of $45,001. Each company reserved the right to seek recoupment of its contribution from the other, which led to this action.

Philip L. Pillsbury, Jr., Pillsbury & Wilson, San Francisco, Cal., for plaintiff.

Frederick Mahan, Mahan and Rolph, Roper, Majeski, Kohn, Bentley, and Wagner, San Francisco, Cal., for defendants.

## MEMORANDUM OF OPINION AND ORDER

SCHWARZER, District Judge.

Plaintiff Cranford Insurance Co. ("Cranford") seeks reimbursement from defendants for a payment it made in settlement of a tort action against its insured, Dr. R., and for a portion of the cost of defense it incurred. Defendant Industrial Indemnity Company ("Industrial") in turn seeks reimbursement for its contribution to the settlement. Industrial and Continental Casualty Company ("Continental") have moved for summary judgment.

## FACTS

From June 1979 through May 1981, Ms. G. received psychiatric treatment from Dr. R. which included therapy and medication. She suffered from a psychosis that stemmed at least in part from childhood sexual molestation. In about May 1981, the two entered into a sexual relationship which lasted until October 1981.

In March 1982, Ms. G. filed an action for damages in state court against Dr. R. She alleged claims based on medical malpractice and infliction of emotional distress. Dr. R. tendered the defense to Cranford, his malpractice carrier, which accepted un-

## DISCUSSION

A. Summary Judgment

Both Industrial and Continental have moved for summary judgment. Resolution of the issues raised by the motions turns on the interpretation and application of the policies issued by the respective companies. While there are some disputes over some of the facts concerning the relationship between Dr. R. and Ms. G., they are not material to the resolution of the coverage issue. For purposes of this action, the Court views the facts in the light most favorable to Dr. R., and hence to his malpractice carrier Cranford, the non-moving party. *Beckham v. Safeco Ins. Co. of America*, 691 F.2d 898, 902 (9th Cir.1982).

The interpretation of language in an insurance policy is a question of law properly decided on summary judgment. *Continental Casualty Co. v. City of Richmond*, 763 F.2d 1076, 1079 (9th Cir.1985). In this case expert testimony is necessary to determine the significance of the insured's conduct for purposes of applying policy language, as hereafter discussed. Industrial has offered expert testimony on the fact in issue, i.e. whether Dr. R.'s conduct involved malpractice. Cranford, as the plaintiff, has the burden of proof on that issue. Therefore, it "may not rest upon the mere allegations or denials of its pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). It has, how-

ever, failed to come forward with evidence to dispute Industrial's showing.[1] Accordingly, summary judgment is appropriate. As the Supreme Court has recently stated,

the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, —— U.S. ——, ——, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). *See also British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978); *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979); *Jones v. Wike*, 654 F.2d 1129, 1130 (5th Cir.1981) (State law required that a plaintiff asserting medical malpractice must present expert medical testimony to overcome the presumption of a physician's care, skill and diligence. Trial court did not err in light of this rule in granting summary judgment for defendant where defendant produced expert opinion as to the reasonableness of his treatment of plaintiff and plaintiff failed to produce any expert affidavits to the contrary).

B. The Cranford Policy

1. Coverage

■ Cranford issued a psychiatrist's professional liability malpractice insurance policy to Dr. R. It provides in part that

The Company agrees ... to pay or make good to the Assured ... such damages as may be awarded against the Assured in respect of professional services rendered by him in his practice of psychia-

try, or which should have been rendered by the Assured ... and resulting from any claims or suits ... based solely upon malpractice, error, negligence or mistake ...

The policy excludes

... damages awarded in suits ... involving undue familiarity, sexual intimacy, or assault concomitant therewith.

Thus, Cranford's policy applies if Dr. R. committed professional "malpractice, error, negligence or mistake" that did not "involve" "sexual intimacy."

Industrial contends that Dr. R. breached his duty of care as a psychiatrist in at least two ways: first, he mishandled the transference process, which is a basic part of psychoanalytic technique; and second, he abandoned his patient in breach of the standards of practice in the state.

To determine whether Dr. R. committed a professional breach requires resort to the opinion of experts. Under California law, the standard of skill, knowledge and care prevailing in a medical community and the propriety of particular conduct by a physician can only be established by expert testimony. *See Landeros v. Flood*, 17 Cal.3d 399, 410, 131 Cal.Rptr. 69 (1976); *Starr v. Mooslin*, 14 Cal.App.3d 988, 999, 92 Cal. Rptr. 583 (1971). Industrial has submitted the declaration of Dr. Ronald C. Diebel, a psychiatrist. Dr. Diebel treated Ms. G. during her first hospitalization in October 1981, and reviewed the depositions of Dr. R. and Ms. G.

According to Dr. Diebel, Dr. R. violated the standard of care by mishandling the transference process and terminating ther-

---

**1.** A word about the procedure pursued in this case will be useful.

In accordance with the practice frequently adopted by this Court, it issued its proposed ruling to counsel on the afternoon preceding the noticed hearing, in order to assist counsel in focusing oral argument. That ruling was in substantially the form of this memorandum.

In an attempt to satisfy Rule 56(e), counsel for Cranford then obtained a declaration from Dr. William Ayres and delivered it to the Court minutes before the hearing. The declaration disputed Dr. Diebel's opinion that Dr. R. had abandoned his patient. Counsel for the oppos-

ing parties did not receive it until that morning; Cranford claimed to have served it by mail the preceding day.

This Court's Local Rule 220-3 clearly requires papers opposing a motion to be filed 14 days preceding the noticed hearing. The Court does not read Fed.R.Civ.P. 56(c) as abrogating that rule, but in any case, delivery of an opposing declaration after issuance of a proposed ruling just before argument does not appear to come under that rule.

The Court will therefore not consider the Ayres declaration.

apy with transference left unresolved. Transference commonly occurs in the course of psychiatric therapy. It "reflects an emotional reaction of the patient towards the psychiatrist, and is frequently positive in nature in that emotions of love, affection and dependency the patient has for other people in her life are transferred ... to the analyst." The psychiatrist makes use of this phenomenon in treating the patient.

In Dr. Diebel's opinion, Dr. R. should have anticipated that transference would be an integral part of Ms. G.'s therapy, particularly in light of her history and symptoms. He states that Dr. R.

> knew or should have known, as a practicing psychiatrist, that a sexual relationship with Ms. G. would have recreated for the patient the incestuous relationship she had previously experienced with her stepfather. In my opinion, this was medical malpractice, i.e. a departure from the applicable psychiatric standard of care. Ms. G.'s injuries in response to this situation were psychiatric in nature, and could have been anticipated.

Dr. Diebel further states that Dr. R.'s formal termination of treatment in his office did not make his subsequent conduct less of an abuse of the transference process. The American Psychiatric Association's Ethics Committee has concluded that sexual involvement between doctor and patient always raises problems of transference, so that the time of commencement of the relationship is irrelevant.

In addition, according to Dr. Diebel, Dr. R. violated the standard of care by discontinuing treatment at a time when Ms. G. was still in need of therapy:

> Dr. R.'s act of providing Ms. G. with the name of another psychiatrist who she could call, without actually setting up an appointment, or taking further steps to *require* Ms. G. to engage in further psychiatric treatment, resulted in an abandonment of his patient, from the medical standpoint, in and of itself a breach of the standards of practice of psychiatrists in this State.

This abandonment "may have, in itself, contributed to the psychiatric symptoms" that Ms. G. displayed following termination of her sexual relationship with her doctor.

Cranford argues in response that, in determining whether Dr. R. committed malpractice, the Court should use an "objective test" "which examines the overt, express acts of doctor and patient." In support of its position that Dr. R.'s sexual relationship with his patient was purely personal, Cranford cites such factors as the doctor's termination of treatment, his ceasing to bill the patient, and that the parties conducted their relationship outside the office.

This argument fails to take into account the complex nature of a psychiatrist's relationship to his patient. More importantly, it disregards California law that only expert testimony can establish the medical standard of care and whether it was breached. Cranford has submitted no expert evidence to refute Dr. Diebel's declaration.

Cranford's reliance on excerpts from the G. and R. depositions and from the trial record in *G. v. R.* is misplaced. The depositions alone, without expert evidence interpreting them, do not contradict Industrial's evidence respecting the standard of care and hence do not raise a material issue of fact. The excerpt from the trial record is a statement by Dr. R.'s attorney which was stipulated to by both parties and approved by the court. It states that the sexual relationship between Dr. R. and Ms. G. was "a purely social relationship, not involving a professional activity, not involving an ethical activity." According to Cranford's Memorandum of Points and Authorities, the stipulation presents the sole factual basis for the $77,000 settlement.

It is clear from the context that the statement was self-serving, made for the purpose of avoiding the requirement that certain incidents be reported to the state board regulating psychiatrists. Moreover, since both insurance companies entered into the settlement under an express reservation of rights, the statement should not be permitted to prejudice one against the

other. Finally, the statement does not supply the expert opinion necessary to contradict that offered by Industrial.[2]

### 2. Exclusion

While Industrial has thus established that Ms. G.'s complaints fell within the basic coverage of Cranford's malpractice policy, it remains to be determined whether the policy's exclusion of claims "involving ... sexual intimacy" applies to the two areas in which Dr. R. committed malpractice, i.e. transference and abandonment. This question requires interpretation of the terms of the exclusion, which in California is "an issue of law upon which the Court must make its own independent determination." *Continental Casualty Co. v. City of Richmond,* 763 F.2d 1076, 1079 (9th Cir.1985) (citations omitted).

■ The term "involving," though lacking precision, has a common meaning and presents no difficulty in interpretation. It may be assumed that Dr. R.'s mishandling of the transference process did "involve" his sexual intimacy with Ms. G. Indeed, the sexual relationship itself constituted the mishandling. Therefore, this claim, although based on malpractice, is excluded from coverage.

■ However, Dr. R.'s abandonment of his patient did not "involve" sexual intimacy. According to Dr. Diebel's expert opinion, Dr. R. terminated his treatment at a time when his patient had continuing psychiatric problems requiring therapy. Dr. R. failed to take necessary steps to see that Ms. G. consulted with another psychiatrist. This abandonment in and of itself may have contributed to Ms. G.'s injuries. The malpractice the doctor committed in abandoning his patient was wholly independent of his sexual intimacy with her, and consisted only of his failure to see that she continued treatment. This claim, therefore, is not excluded from coverage under the Cranford policy.

2. See *supra,* note 1.

3. It is immaterial to Industrial's right to recover that the malpractice claim, in part, falls within

■ Under California law, where an insured risk and an excluded risk constitute concurrent proximate causes of an injury, a liability insurer is liable if one of the causes is covered by the policy. *State Farm Mutual Automobile Insurance Co. v. Partridge,* 10 Cal.3d 94, 109 Cal.Rptr. 811, 817–18, 514 P.2d 123 (1973). In this case, Dr. R.'s abuse of the transference process and his abandonment of Ms. G. were each potential proximate causes of her psychological injuries. While the first risk was excluded under Cranford's policy, the second was not. Therefore, Industrial is entitled to a declaration that Cranford may not recover the amount it paid in settlement.

### C. The Industrial Policy

#### 1. Indemnity

■ The policy issued by Industrial specifically excludes, in its relevant part, liability for

bodily injury ... arising out of the rendering of or failure to render professional services.

Industrial's expert testimony establishes that Dr. R.'s conduct arose out of the rendering of professional services. Cranford has come forward with no contradictory expert testimony. It follows that the claim falls within the exclusion in the Industrial policy. (*See also infra* at 1446–47)[3] Industrial is therefore entitled to recover from Cranford its settlement contribution of $45,001.

#### 2. Duty to Defend

■ The Industrial policy provides that the "Company shall have the right and duty ... to defend any suit against the Insured seeking damages on account of" "bodily injury or property damage, to which this insurance applies."

An insurance carrier "must defend a suit which *potentially* seeks damages within the coverage of the policy." *Gray v. Zurich Insurance Company,* 65 Cal.2d 263,

the exclusion for sexual misconduct under the Cranford policy.

54 Cal.Rptr. 104, 112, 419 P.2d 168 (1966) (emphasis in the original). *See also Mullen v. Glens Falls Insurance Company,* 73 Cal.App.3d 163, 140 Cal.Rptr. 605 (5th Dist.1977).

Thus, the duty to defend is broader than the duty to indemnify, encompassing instances where liability under the policy is only potential. *CNA Casualty of California v. Seaboard Surety Company,* 176 Cal.App.3d 598, 606, 222 Cal.Rptr. 276 (1986).

The duty to defend arises when the insurer has factual information that its insured faces potential liability covered by the policy. *Continental Casualty Company v. City of Richmond,* 763 F.2d 1076, 1083 (9th Cir.1985) (applying California law). The insurer may not rely solely on the allegations made in the complaint in determining whether its coverage is implicated. Rather,

> the duty to defend should be fixed by the facts which the insurer learns from the complaint, the insured, or other sources. An insurer, therefore, bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy.

*Gray v. Zurich, supra,* 54 Cal.Rptr. at 113, 419 P.2d at 169.

The Declaration of George Karabian in Support of Industrial's Motion for Summary Judgment states that on or about November 3, 1983, Industrial received a copy of the original G. complaint and a copy of the letter written by Cranford's attorney Pillsbury requesting Industrial's participation in Dr. R.'s defense. The Pillsbury letter outlined the facts underlying the claim against Dr. R. and asserted that "the claim arises—in large part—out of social circumstances only tangentially related to Dr. R.'s psychiatric practice. We believe that the claim arises not out of Dr. R.'s occupation, but out of the personal context of a social relationship with the plaintiff." Although the Pillsbury letter was an adversarial communication, it nonetheless offered facts implicating Industrial's coverage.

In addition, in late November 1983, Industrial received further information alerting it to the potential of liability under its policy. At that time Karabian received from Pillsbury copies of the R. deposition taken on September 28, 1983, and the G. deposition taken on September 29, 1983. These depositions disclosed that Dr. R.'s sexual relationship with Ms. G. might potentially be characterized as nonprofessional. For example, Dr. R. testified that his sexual relationship with Ms. G. began only after he had terminated their therapeutic relationship, and that he told Ms. G. on her last visit that she should make it clear to others that their relationship was not as doctor and patient but as friends.

Ms. G.'s testimony also indicated that she considered her sexual relationship with Dr. R. (as opposed to the isolated sexual encounters in his office) to have commenced subsequent to the termination of her therapy.

Testimony in these depositions was sufficient as a matter of law to put Industrial on notice that Dr. R. might be liable for injuries arising from conduct outside of the scope of his professional activities. Industrial knew or should have known in November 1983 that its policy might apply to Dr. R.'s relationship with Ms. G.

Although the original G. complaint only alleged medical malpractice, a duty to defend arose when Industrial discovered facts indicating that Dr. R. potentially faced liability covered under its policy, i.e., liability for bodily injuries not "arising out of the rendering of or failing to render professional services." Accordingly, Industrial's motion on this issue must be denied; Cranford is entitled to pro rata reimbursement from Industrial of the costs of defense expended by it from the time of the tender to Industrial.

**D. The Terms of the Continental Policy**

 As an excess insurer, Continental was under no duty to defend. *Signal Companies v. Harbor Insurance Company,* 27 Cal.3d 359, 165 Cal.Rptr. 799, 804, 612 P.2d 889 (1980) ("where there is excess

coverage, whether by virtue of an excess clause in one policy or otherwise it is the primary insurer which is solely liable for the costs of defense if the judgment does not exceed"). *See also Olympic Insurance Company v. Employers Surplus Lines Insurance Company*, 126 Cal. App.3d 593, 178 Cal.Rptr. 908, 912 (1st Dist.1981) ("if the loss is within the limits of the primary insurance, the primary insurer will be liable for the entire cost of defense").

The case before the Court falls squarely under *Signal*. The Continental policy provides coverage in excess of the coverage provided by Industrial, i.e. $100,000. Since *G. v. R.* settled for $77,000, Continental's duty to defend as an excess insurer was never triggered.

Continental, however, also provided limited primary coverage. The Continental policy states that "If for some reason your basic policies do not cover and this policy does ..., we will step in as if we were one of your basic policies." The policy "covers some unusual claim situations which are not covered by your basic policies"—situations where the basic policy does not apply but Continental's does. The claim against Dr. R. by Ms. G. was potentially just such an "unusual claim situation."

Under the terms of its policy, then, Continental had a potential duty both to defend and to provide coverage. The latter duty does not come into play in view of the Court's holding that the Cranford policy provided coverage. Accordingly, Continental has no obligation to contribute to the settlement.

Continental's duty to defend under its policy presents a different question. Continental knew that Cranford was denying coverage and was defending under a reservation of rights. Furthermore, it had notice of facts indicating the possibility that Cranford's policy might not apply. Continental received the same information from Pillsbury in November and December, 1983 (*see supra* at 1445–46) as did Industrial. Thus it knew or should have known that Dr. R. might be held liable for injuries which might be found not to have arisen out of his professional services, or if they did, were committed after he terminated his professional services.

The information Continental had also gave it notice of the possibility that Industrial's policy might not cover. Industrial had rejected the tender of defense. Although both Continental's and Industrial's policies had exclusions for professional malpractice, Industrial's exclusion was broader. Industrial's policy excludes "bodily injury ... arising out of the rendering of or failing to render professional services." Continental's policy states that "If anyone covered is a physician, ... or other professional person, we will not cover any malpractice, error, or omission which is committed in the performance of their profession as such ..."

On its face, Industrial's exclusion is broader than Continental's, since it excludes activities "arising out of" business and professional services, while Continental's exclusion is limited to acts or omissions "committed in the performance of [a] profession."

While exclusionary clauses that are ambiguous are construed narrowly against the insurer, *State Farm Mutual Automobile Insurance Company v. Partridge*, 10 Cal.3d 94, 109 Cal.Rptr. 811, 816, 514 P.2d 123 (1973), where the exclusionary clause is not ambiguous the terms are to be interpreted in their "plain and ordinary sense." *Connick v. Teachers Insurance and Annuity Association of America*, 784 F.2d 1018, 1020 (9th Cir.1986) (applying New York and California law).

A recent Ninth Circuit case has interpreted the terms "arising from" or "arising out of" in exclusionary clauses as both unambiguous and susceptible of a broad definition. *Continental Casualty Company v. City of Richmond*, 763 F.2d 1076, 1080 (9th Cir.1985) (applying California law). In *City of Richmond*, the Ninth Circuit upheld a grant of summary judgment in favor of an insurer. The insurer was found not liable on a claim against the city for wrongful death and constitutional violations which arose when police officers allegedly

killed a prisoner detained in jail. The policy contained an exclusionary clause which provided that the insurer would not be liable on any claim arising from the bodily injury, assault, battery, or death of any person. *Id.* at 1078. The court found that the claims asserted were expressly excluded under this clause.

The interpretation of "arising from" was central to the dispute over coverage. *Id.* According to the Ninth Circuit,

> ... California courts consistently have adopted broad definitions of 'arising from' and 'arising out of.' One court equated 'arising out of' with 'origination, growth, or flow form the event.' *Pacific Indemnity Co. v. Truck Insurance Exchange*, 270 Cal.App.2d 700, 704, 76 Cal. Rptr. 281, 283–84 (3d Dist.1969). Another court, in *Hartford Accident & Indemnity Co. v. Civil Service Employees Insurance Co.*, 33 Cal.App.3d 26, 108 Cal. Rptr. 737 (3d Dist.1973), held that 'arising out of the use of an insured vehicle imports some kind of sequential relationship between the vehicle and the accident.' 33 Cal.App.3d at 32–33, 108 Cal. Rptr. at 741 ... The court added that 'arising out of' has been interpreted more broadly than 'caused by' to include the notion of 'incident to or having connection with.' *Id.*

The exclusion in Continental's policy for acts "committed in the performance of their profession as such" is reasonably read as limited to acts occurring in the course of professional services. The dictionary definition of "performance" supports this interpretation: "1a: the act or process of carrying out something: the execution of an action ..." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1678 (1971).

It follows that Industrial's exclusion, which extends to any personal injury "arising out of" professional activities, is broader than Continental's exclusion. The psychological injury inflicted on Ms. G. as a result of the relationship she had with Dr. R. after professional treatment was terminated may be held to have "aris[en] out of" Dr. R.'s professional services, without hav-

ing been "committed in the performance" of those services.

Accordingly, because the claim asserted might have been excluded under the Cranford and Industrial policies yet covered by the Continental policy, Continental stood in the position of a primary insurer and was under a duty to defend. It is therefore liable for its pro rata share of the cost of defense from the time of tender.

The parties are directed to submit an appropriate form of judgment within ten days. Each party will bear its own costs.

IT IS SO ORDERED.