955 P.2d 982

**CHICAGO INSURANCE COMPANY,**
an Illinois corporation,
**Plaintiff–Appellee,**

v.

**AnNette MANTEROLA, a single woman,**
**Defendant–Appellant.**

**No. 1 CA–CV 97–0245.**

Court of Appeals of Arizona,
Division 1, Department E.

March 19, 1998.

---

Gust Rosenfeld P.L.C. by Richard A. Segal and Natasha M. Price, Phoenix, for Plaintiff–Appellee.

Law Offices of A. Thomas Cole by A. Thomas Cole, Casa Grande, for Defendant–Appellant.

## OPINION

GARBARINO, Judge.

¶ 1   Chicago Insurance Company (Chicago) filed a declaratory action putting at issue its obligation to provide coverage for claims asserted against Dr. Dennis Elias and his wife by AnNette Manterola (Manterola), which arose out of the psychologist/patient relationship.  Manterola appeals the grant of summary judgment in favor of Chicago.  We affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶ 2   In March 1992, Dr. Elias, a psychologist, began treating Manterola for severe emotional problems.  He eventually engaged in a sexual relationship with her.  Dr. Elias was covered by a Chicago "Psychologists Professional Liability Claims–Made Insurance Policy."

¶ 3   On August 9, 1995, Manterola sued Dr. Elias and his wife.  She alleged professional negligence, a number of intentional torts, and statutory claims against Dr. Elias. She also alleged a negligence claim against Mrs. Elias.  Chicago agreed to defend, but reserved its right to deny coverage based on policy language and various exclusions.

¶ 4   Manterola and the Eliases entered into an agreement stipulating to judgment (the agreement) in the amount of $2 million in favor of Manterola.  As part of the agreement, Manterola covenanted not to execute on the judgment against the Eliases.  In return, the Eliases assigned their rights against Chicago and other insurers[1] to Manterola.  The agreement further stated:

Dr. Elias hereby asserts and acknowledges that, during the ordinary course of his vocation as a treating psychologist, he provided treatment to AnNette and, after termination of formal professional service and treatment to her, he engaged in a sexual relationship with her.

¶ 5   Chicago filed its declaratory action, seeking a determination that its policy did not cover Manterola's claims against the Eliases.  Chicago moved for summary judgment, contending that the agreement stated that the sexual relationship between Dr. Eli-

1.  In addition to the Chicago policy, Manterola also sought coverage from the Eliases' home-owners policy, a personal umbrella policy, and a general commercial liability policy (the Farmers Policies).  The Farmers insurers filed a separate declaratory judgment action against Manterola which was consolidated with this matter.  The Farmers insurers obtained summary judgment in their favor.  Manterola has also appealed that ruling.  We address that appeal in a separate decision.  *See Farmers Ins. Co. of Arizona, et al. v. Manterola*, 1 CA–CV 97–0382, — Ariz. —, — P.2d — (App. Mar. 10, 1998).

as and Manterola occurred *after* the termination of her therapy. Chicago argues that the policy limits its responsibility to sums which the insured became obligated to pay as damages stemming from "the practice of psychology by the [i]nsured." Chicago next asserted a lack of coverage based upon Exclusion G of the policy, which precludes coverage for damages resulting from sexual misconduct. Last, Chicago claimed a lack of coverage based upon the intentional acts exclusion of the policy. Chicago also denied that Mrs. Elias was an insured entitled to coverage under the policy.

¶ 6 The trial court granted summary judgment in favor of Chicago, finding that the alleged acts of Dr. Elias fell within Exclusion G, the sexual acts exclusion, of the policy. Manterola timely filed this appeal. We have jurisdiction pursuant to Arizona Revised Statutes Annotated (A.R.S.) section 12–2101(B) (1994).

### ISSUES

I. Whether Exclusion G of the policy precludes coverage for damages arising from sexual misconduct.

II. Whether the policy fails to cover the claims against Mrs. Elias.

### STANDARD OF REVIEW

¶ 7 In reviewing a summary judgment, this Court considers the facts in the light most favorable to the non-movant. *Estate of Hernandez v. Flavio,* 187 Ariz. 506, 509, 930 P.2d 1309, 1312 (1997). We determine *de novo* whether the trial court correctly applied the law. *See AHCCCS v. Bentley,* 187 Ariz. 229, 231, 928 P.2d 653, 655 (App.1996); *see also Hudnell v. Allstate Ins. Co.,* 190 Ariz. 52, 945 P.2d 363, 364 (App.1997) (interpretation of an insurance contract is a matter of law reviewed *de novo* ); *Citibank (Arizona) v. Bhandhusavee,* 188 Ariz. 434, 435, 937 P.2d 356, 357 (App.1996) (interpretation of a stipulated judgment and settlement agreement are questions of law subject to *de novo* review). We will affirm a "summary judgment only when the facts presented by the opposing party in support of [its] claim or defense have so little probative value that reasonable

minds could not agree with the conclusion being advanced." *Lasley v. Helms,* 179 Ariz. 589, 591, 880 P.2d 1135, 1137 (App.1994). This Court may affirm the trial court's grant of summary judgment if it is correct for any reason. *Logerquist v. Danforth,* 188 Ariz. 16, 18, 932 P.2d 281, 283 (App.1996).

### DISCUSSION

I. *Exclusion G of the Policy, Precluding Coverage for Damages Arising from Sexual Misconduct, Bars Coverage of Manterola's Claims.*

A. Manterola's Claims Fall Within Exclusion G.

■ ¶ 8 Chicago asserted, and the trial court agreed, that Exclusion G of the policy precludes coverage of Manterola's claims against Dr. Elias. Exclusion G provides in pertinent part:

This insurance does not apply:

. . . .

G. to any **Claims** made or Suits brought against any **Insured** alleging, in whole or part, sexual assault, abuse, molestation, or licentious, immoral, amoral or other behavior which threatened, led to or culminated in any sexual act whether committed intentionally, negligently, inadvertently or with the belief, erroneous or otherwise, that the other party is consenting and has the legal and mental capacity to consent thereto, that was committed, or alleged to have been committed by the Insured or by any person for whom the **Insured** is legally responsible.

¶ 9 Manterola's claims against Dr. Elias stem *entirely* from the mishandling of the transference phenomenon and the resulting sexual relationship with her. Manterola has not alleged any other act of malpractice by Dr. Elias other than his development of a sexual relationship with her. She complained that Dr. Elias's misconduct consisted of the following:

negligently, carelessly, unethically, in breach of his fiduciary duty, in violation of his professional obligation to her and without due regard to his position of confi-

dence, superiority and responsibility, commence to negligently mistreat, exploit, abuse, discriminate against and molest AnNette, and continued to do so from approximately 1992 through approximately January, 1995, in various particulars, *including, but not limited to, the following: predatory behavior of grooming, gaining her confidence, holding and hugging her and "treating" her with romantic assurances, whereupon, Elias had sex with AnNette.* (Emphasis added). Similarly, the only wrongdoing by Dr. Elias asserted in the agreement was his sexual contact with Manterola. The agreement stated:

> Dr. Elias hereby asserts and acknowledges that, during the ordinary course of his vocation as a treating psychologist, he provided treatment to AnNette and, after termination of formal professional service and treatment to her, he engaged in a sexual relationship with her. But for the stress Dr. Elias was under in having to deal with patients' demands, upheaval with office staff and administration, and other life and medical problems, he believes he would not have made this error of judgment and consequently had these careless sexual relations with AnNette. Dr. Elias had completed treating AnNette for serious psychological problems that were a function of hugely complex family and post-family circumstances, the uncovering of which emerged after her automotive accident and marriage. In retrospect, Dr. Elias' fatigue and emotional exhaustion caused him to mishandle the relationship with AnNette. Dr. Elias now appreciates that it was imprudent to fail to recognize AnNette's emotional instability and allow their relationship to become sexual, and, [sic] further, [sic] his own emotional self-interests. Dr. Elias acknowledges that AnNette had been subject to a series of harsh, abusive and non-nurturing relationships from (1) father, (2) rapist, (3) husband, and others, and suffered from PTSD. Dr. Elias became infatuated with AnNette and could not disentangle his professional

services from his secondary emotional attachment. Dr. Elias thought it would not be detrimental to her.

¶ 10 Because all of the alleged misconduct by Dr. Elias was behavior "which threatened, led to or culminated in any sexual act," Exclusion G of the policy bars Manterola's claims.

### B. Exclusion G is Not Void Against Public Policy.

¶ 11 Manterola does not dispute that her claims fall within the parameters of Exclusion G. However, she contends that Exclusion G is void against the public policy of this state. Manterola asserts that public policy weighs in favor of compensating innocent victims. She further asserts that Chicago's coverage of her claims will not encourage sexual misconduct by other therapists because there are other deterrents, such as professional censure and possible criminal liability. In support of this argument, Manterola relies on *American Home Assurance Co. v. Cohen,* 124 Wash.2d 865, 881 P.2d 1001 (1994), in which she asserts that the Washington Supreme Court held a similar sexual acts exclusion void against public policy.

¶ 12 We believe Manterola misinterprets the holding of *American Home.* In *American Home,* the court held that a limitation on recovery for sexual misconduct claims against psychologists did *not* conflict with any state public policy. *Id.* at 1009. *American Home* arose out of the psychologist/patient relationship of Dr. David Cohen and Theresa Scott. The Scotts sued Dr. Cohen, alleging that he mishandled Theresa's transference phenomenon [2] and engaged in a sexual relationship with her. *Id.* at 1003–04. American Home had issued Dr. Cohen a professional liability policy with a $1 million limit. *Id.* at 1003. However, the policy contained a $25,000 liability sublimit for claims involving sexual misconduct, even if non-sexual misconduct was also alleged. *Id.*

---

**2.** In the transference phenomenon, a patient transfers usually positive feelings of love and affection felt for others onto the psychiatrist. *Cranford Ins. Co., Inc. v. Allwest Ins. Co.,* 645

F.Supp. 1440, 1443 (N.D.Cal.1986). The psychiatrist may mishandle the transference phenomenon by engaging in a romantic and/or sexual relationship with the patient. *Id.*

¶ 13 While American Home was defending Dr. Cohen in the Scotts' lawsuit under a reservation of rights, it filed a declaratory action in district court, alleging that the Scotts' entire recovery was limited to $25,000 under the sexual misconduct liability sublimit. *Id.* at 1004. The Scotts countered that the provision was void because it was against public policy. *Id.* The district court concluded that the public policy of Washington did not preclude the liability sublimit for sexual misconduct claims, but the limitation on recovery for non-sexual misconduct where sexual misconduct was also alleged did violate the state's public policy. *Id.* Both the Scotts and American Home appealed to the Ninth Circuit Court of Appeals. *Id.*

¶ 14 The Ninth Circuit certified two questions to the Washington Supreme Court: (1) whether it violated the public policy of Washington for an insurer to provide lesser coverage for a psychologist's sexual misconduct than for his or her non-sexual misconduct; and (2) whether it violated the public policy of the state for an insurer to provide lesser coverage for claims of non-sexual misconduct where sexual misconduct was also alleged to have occurred. *Id.* at 1005.

¶ 15 With regard to the first question, the Washington Supreme Court concluded that providing lesser coverage for a psychologist's sexual misconduct than for non-sexual misconduct did not violate the public policy of the state. *Id.* To the contrary, the court found that this provision corresponded with state policy opposing insuring against liability arising from the intentional infliction of injury on the person of another. *Id.* The court noted that it is undisputed that a psychologist's sexual contact with a client was wrongful, unprofessional, unethical, and possibly criminal. *Id.* The court looked to Washington's statutes to determine the public policy of the state. *Id.* at 1007. While there was no Washington statute expressly or implicitly requiring financial compensation for injuries resulting from a psychologist's

sexual misconduct, there were criminal and professional misconduct statutes prohibiting a psychologist's sexual contact with a client. *Id.* at 1007–08, 1010.

¶ 16 The court also discussed studies indicating that a significant percentage of claims against psychologists was based on sexual misconduct, and held that the limitation on recovery for such claims was based on an identifiable risk to the insurer which did not conflict with any state public policy.[3] *Id.* at 1009; *see also American Home Assurance Co. v. Stone,* 61 F.3d 1321, 1328 (7th Cir.1995) (holding professional liability insurer's limitation on liability for sexual misconduct did not violate Illinois public policy).

¶ 17 Similarly, the sexual acts exclusion of the Chicago policy at issue does not violate Arizona public policy. Arizona statutes clearly proscribe sexual contact between psychologists and their patients. One statute criminalizes sexual intercourse between a psychologist and a current patient (A.R.S. section 13–1418 (Supp.1997)), while others deem sexual intimacy between a psychologist and a current or former patient "unprofessional conduct" which subjects the psychologist to censure, probation, suspension, or revocation of his or her license. *See* A.R.S. § 32–2061(A)(13)(f) (Supp.1997) ("unprofessional conduct" by a psychologist includes "sexual intimacies or sexual intercourse with a current client ... or with a former client within two years after the cessation or termination of treatment"); A.R.S. § 32–2081(K) (Supp.1997) (setting forth disciplinary measures for unprofessional conduct). Arizona public policy also forbids contracts indemnifying a person against loss from willful wrongdoing. *See Transamerica Ins. Group v. Meere,* 143 Ariz. 351, 356, 694 P.2d 181, 186 (1984) (intentional acts exclusions coincide with public policy opposing insuring against liability for one's willful, wrongful acts). These public policies support the exclusion at issue.

---

3. The court did find that the provision limiting coverage for non-sexual misconduct where sexual misconduct was also alleged violated the public policy of the state because it discouraged patients from reporting sexual misconduct (conduct the legislature sought to eradicate) since

such reports could reduce their recovery. *American Home,* 881 P.2d at 1009–10.

That issue is not before us, however, because, as discussed, Manterola has only alleged sexual misconduct by Dr. Elias.

¶ 18 Manterola mistakenly suggests that insurers regularly indemnify criminal actors for damages arising from their criminal conduct. The cases on which she relies, *Meere,* 143 Ariz. 351, 694 P.2d 181, *Fire Insurance Exchange v. Berray,* 143 Ariz. 361, 694 P.2d 191 (1984), and *Republic Insurance Co. v. Feidler,* 178 Ariz. 528, 875 P.2d 187 (App. 1993), do not support this proposition. In *Meere,* the court approved an intentional acts exclusion as comporting with the public policy against insuring against liability for one's willful misconduct, but stated that acts done in self-defense might not be considered willful wrongdoing. 143 Ariz. at 356–60, 694 P.2d at 186–90; *see also Berray,* 143 Ariz. at 363–64, 694 P.2d at 193–94. Similarly, in *Feidler,* this Court questioned whether the insured lacked the intent to injure for purposes of an intentional acts exclusion when voluntary intoxication may have deprived him of the mental capacity needed to form such intent. 178 Ariz. at 531–32, 875 P.2d at 190–91.

¶ 19 In light of the fact that a significant percentage of claims against psychologists is based on sexual misconduct and that such claims present a recognizable risk to insurers, many courts have noted that professional liability insurers who wish to avoid coverage of such claims should include sexual acts exclusions, like the one present here, in their policies. *See, e.g., Govar v. Chicago Ins. Co.,* 879 F.2d 1581, 1582–83 (8th Cir.1989) (finding no coverage for damages arising out of sexual relationship between psychologist and patient where professional liability policy excluded claims arising out of sexual acts); *Cranford Ins. Co., Inc. v. Allwest Ins. Co.,* 645 F.Supp. 1440, 1442–44 (N.D.Cal.1986) (holding exclusion of damages arising from suits involving undue familiarity, sexual intimacy, or concomitant assault applied to transference mishandling claim); *Vigilant Ins. Co. v. Employers Ins. of Wausau,* 626 F.Supp. 262, 266 n. 2 (S.D.N.Y.1986) (noting professional liability insurer could have avoided coverage for mishandling of transference phenomenon by including sexual acts

exclusion in policy); *St. Paul Fire & Marine Ins. Co. v. Love,* 459 N.W.2d 698, 702 (Minn. 1990) (same). Chicago included just such a provision to protect itself from claims like the ones at issue. Nothing about the provision in Chicago's policy violates the public policy of this state. Exclusion G precludes coverage of Manterola's claims.[4]

## II. *The Chicago Policy Does Not Cover the Claims Against Mrs. Elias.*

¶ 20 Manterola asserts that even if there is no coverage for Dr. Elias under the Chicago policy, Mrs. Elias still had a reasonable expectation for coverage of the separate negligence claims asserted against her. We disagree.

¶ 21 Manterola has admitted that Mrs. Elias is not a named insured under the Chicago policy. Manterola asserts, however, that Mrs. Elias has an interest in coverage as a "negligent coinsured."

¶ 22 Manterola has not explained how Mrs. Elias came to be a coinsured, and the policy does not support this assertion. Mrs. Elias is not a named insured under the policy (Dr. Elias's professional corporation is the named insured), nor is there any evidence that Mrs. Elias fits any definition of an "Insured" under the policy.

¶ 23 Manterola also alleges that Mrs. Elias has a separate community property interest in the policy. However, Manterola has not demonstrated how that interest can increase the coverage provided by the policy. The terms of the policy remain the same regardless of this community interest, and Exclusion G of the policy eliminated coverage for Dr. Elias's misconduct. Manterola has not presented any facts showing that Mrs. Elias has a reasonable expectation of coverage under the policy.

## CONCLUSION

¶ 24 The trial court correctly concluded that Exclusion G of the policy did not conflict with the public policy of this state and barred

---

4. In light of our conclusion that Exclusion G of the policy precludes coverage of Manterola's claims against Dr. Elias, we will not address Chicago's arguments that Dr. Elias's misconduct fell outside the "practice of psychology" and was therefore not covered under the policy, or that the intentional acts exclusion of the policy bars coverage of Manterola's claims.

coverage of Manterola's claims against Dr. Elias. Manterola has not demonstrated that Mrs. Elias is a separate insured or has any reasonable expectation of coverage under this policy. Therefore, we affirm the judgment of the trial court.

SULT, P.J., and KLEINSCHMIDT, J., concurring.