MARY ROE & another[1] vs. FEDERAL INSURANCE COMPANY
& another.[2]

Hampshire. January 7, 1992. - February 26, 1992.

Present: LIACOS, C.J., ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Dentist. Insurance*, Medical malpractice insurance, Coverage, Construc-
tion of policy. *Words*, "Professional services."

A dentist's policy of professional liability insurance covering "[i]njury aris-
ing out of the rendering of or failure to render . . . professional services
by [the dentist] . . . performed in the practice of [his] profession as a
dentist" did not afford coverage for claims by a patient and her hus-
band based on the dentist's intentional acts of sexual misbehavior to-
ward the patient, which occurred when the patient visited the dentist's
office for treatment. [47-54]

CIVIL ACTION commenced in the Superior Court Depart-
ment on March 8, 1988.

The case was heard by *Elizabeth A. Porada*, J., on a mo-
tion for summary judgment.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Richard M. Howland* for the plaintiffs.

*Maria E. DeLuzio* for the defendants.

GREANEY, J. This case raises the question whether a den-
tist's professional liability insurance covers claims by a pa-
tient and her spouse based on the dentist's improper sexual
relationship with his patient. We conclude that it does not.

The patient, Mary Roe, and her husband (plaintiffs),
brought an action in the Superior Court against the dentist,
asserting claims of malpractice, breach of contract, sexual

---

[1]Her husband. We have assigned the patient a fictitious name.

[2]Chubb Group of Insurance Companies.

assault, assault and battery, violation of G. L. c. 93A, intentional infliction of emotional distress, and loss of consortium. The gravamen of the plaintiffs' complaint was that the dentist had sexually assaulted and molested the patient during office visits, in the course of her treatment, at least once after the patient had received novocaine. The plaintiffs settled the action against the dentist for $100,000,[3] and took an assignment from him of his rights under his professional liability policy (his insurers had refused either to defend or to indemnify). The plaintiffs then brought this action against Federal Insurance Company, the company that had issued the dentist's malpractice policy, and Chubb Group of Insurance Companies, of which Federal is a member (insurers), seeking to reach and apply the proceeds of the malpractice policy, see G. L. c. 175, §§ 112-113 (1990 ed.), and G. L. c. 214, § 3 (10) (1990 ed.), and to recover under the assignment of rights given by the dentist for the insurers' alleged breach of contract, negligence, and violation of G. L. c. 93A.

The plaintiffs moved for summary judgment under Mass. R. Civ. P. 56 (a), 365 Mass. 824 (1974). A judge of the Superior Court granted summary judgment for the insurers on all claims, see Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974), concluding that the dentist's professional liability policy did not afford coverage for the intentional acts of sexual misbehavior that had occurred. The plaintiffs appealed, and we transferred the case to this court on our own motion.

The summary judgment record discloses the following facts.[4] The patient, who was referred to the dentist by her

---

[3]The plaintiffs, the dentist, and their respective counsel signed and filed an agreement for judgment disposing of the action. The agreement did not specify on which of the various claims in the plaintiffs' suit against the dentist the settlement was based.

[4]In support of their motion for summary judgment, the plaintiffs submitted an affidavit of the patient's husband detailing, among other things, the events which had occurred between the dentist and his wife. Attached to the affidavit were copies of decisions of the Division of Administrative Law Appeals and the Board of Registration in Dentistry (board) in the related disciplinary proceeding against the dentist, the agreement for judgment in the action brought by the plaintiffs against the dentist, and a copy of the

husband, received treatment from July, 1980, to May, 1983. During numerous office visits, the dentist kissed the patient; touched her breasts and genitalia under her clothing; undressed her from the waist down; undressed himself; inserted his fingers into her vagina; placed her hands on his genitalia; and, during the last visit, pulled her out of the dental chair and attempted unsuccessfully to have intercourse with her. There were approximately twenty office visits, and the sexual incidents occurred at "many" of these visits. On at least one

dentist's insurance policy. The patient also signed the affidavit, stating "I [Mary Roe] have read my husband's affidavit and the facts relative to me are true." The insurers moved in the Superior Court to strike the affidavit on multiple grounds. The judge did not pass on the motion to strike, concluding that, even accepting everything in the plaintiffs' affidavit and its attachments as true, the insurers were entitled to judgment as matter of law. On appeal, the insurers do not press their motion to strike and, consequently, we decide the case in the same way that the judge in the Superior Court did. Our recitation of the facts is taken from the husband's affidavit and the attachments thereto.

Having pointed this out, some other observations about the plaintiffs' submissions are in order. Portions of the husband's affidavit, and the recommended decision of the administrative magistrate and the decision of the board attached to the affidavit, were not presented to the judge in a form appropriate for consideration on a motion for summary judgment. See Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974). Much of the husband's affidavit was clearly not based on personal knowledge, and neither of the attached documents was a "sworn or certified cop[y]," as rule 56 (e) requires. In addition, the documents attached to the husband's affidavit are hearsay, in that they present out-of-court statements about the dentist's alleged sexual misconduct which were offered as evidence of the truth of the statements. See P.J. Liacos, Massachusetts Evidence 262-266, 272-275 (5th ed. 1981). See also K.B. Hughes, Evidence §§ 462, 614 (1961). The plaintiffs did not explain their theory of the admissibility of these documents in their memorandum in support of their motion for summary judgment. Such an explanation clearly would have been required if the motion to strike was decided.

Further, the question of what action, if any, a disciplinary board takes against a medical professional in response to complaints from patients is separate from the legal question whether given misconduct toward one patient is covered by that professional's malpractice insurance policy. The latter is a question of interpretation of the governing insurance policy. Thus, even assuming that the board's finding that the dentist was guilty of gross misconduct was relevant and admissible evidence, it is not dispositive of the issue whether his conduct fell within the coverage of the insurance policy.

occasion, the dentist gave the patient novocaine before making his advances. The treatment furnished by the dentist to the patient involved the cleaning of her teeth, examination of her teeth, recommendations for dental work, replacement of fillings, the extraction of a wisdom tooth and follow-up care (cleaning area of extraction and prescribing appropriate medications).

After the first incident (kissing only), the patient questioned the dentist about his actions. He said that he had done nothing wrong. He told the patient to trust him, and that she and another patient were "special" to him. The patient said that she "felt better" knowing this, but that she had been "going through a depression" and "did not need this."[5]

In December, 1984, the patient filed a complaint against the dentist with the Board of Registration in Dentistry (board). The dentist admitted the acts alleged, but claimed that the patient had consented to them. A hearing was held before the Division of Administrative Law Appeals. See G. L. c. 7, § 4H (1990 ed.); G. L. c. 30A, §§ 10-11 (1990 ed.); 801 Code Mass. Regs. §§ 1.00 et seq. (1986). An administrative magistrate concluded that the dentist had sexually assaulted the patient, that she was a "troubled" woman who lacked the ability to fend off the dentist's advances, and that the dentist continually ignored her pleas to stop. The magistrate also concluded that, even if the dentist's conduct had been part of a "mutually enjoyable relationship," he still would not be excused from professional discipline because "[a] dentist who engages in sexual activity with a patient who has come for dental treatment is guilty of gross misconduct in the practice of his profession." The magistrate recommended that the dentist's license to practice be revoked.

---

[5]The patient stopped making appointments in May, 1983, because she had determined by then that the dentist was not going to stop touching her. She revealed the sexual incidents to her husband in October, 1983, when she found out that her husband had signed a document attesting to the dentist's good character (after another patient had accused the dentist of sexually assaulting her).

Thereafter, the board reviewed the hearing transcript and the magistrate's recommended decision, and found that, because the patient had consented to the dentist's sexual advances, the parties had been engaged in a mutually enjoyable sexual relationship. The board also rejected the magistrate's finding that the dentist had exerted psychological pressure on the patient. Nonetheless, the board concluded that the patient's consent would not exonerate the dentist because "[a] dentist who engages in sexual activity with a patient who has come for dental treatment is guilty of gross misconduct in the practice of his profession." The board suspended the dentist's license. See G. L. c. 112, § 61 (1990 ed.).

During the relevant period, the dentist was insured under a professional liability policy issued by the defendant, Federal Insurance Company. The insuring provision of that policy provided, in pertinent part, as follows:

> "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

> "1. Injury arising out of the rendering of or failure to render during the policy period, professional services by the individual insured . . . performed in the practice of the insured's profession as a dentist. 'As a dentist' shall mean the practice of dentistry as defined by the applicable statutes and licensing laws of the jurisdiction in which the insured practices."

The policy did not define the term "professional services" as used in this provision.

1. The dispositive question is whether the plaintiffs' damages were caused by an "[i]njury arising out of the rendering of or failure to render . . . professional services by [the dentist] . . . performed in the practice of [his] profession as a dentist." The plaintiffs argue that this language should be construed broadly to their benefit and, when it is so considered, the policy covers the dentist's conduct because the con-

duct was intrinsic to, and inseparable from, the dental services sought by and performed on the patient.

We have not had occasion to consider the meaning of the term "professional services," when used in the insuring provision of a medical malpractice policy. In *Marx v. Hartford Accident & Indem. Co.*, 183 Neb. 12, 13 (1968), the Supreme Court of Nebraska considered the term and stated the following:

> "[A medical malpractice] insurer's liability is . . . limited to the performing or rendering of 'professional' acts or services. Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term 'professional' in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual . . . . In determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself." (Citations omitted.)

This statement of a standard, or something close to it, has been widely accepted. See *Harad v. Aetna Casualty & Sur. Co.*, 839 F.2d 979, 984 (3d Cir. 1988); *Curtis Ambulance of Fla., Inc. v. Shawnee County Comm'rs*, 811 F.2d 1371, 1379-1380 (10th Cir. 1987); *Bank of Cal., N.A. v. Opie*, 663 F.2d 977, 981 (9th Cir. 1981); *Horn v. Burns & Roe*, 536 F.2d 251, 255 (8th Cir. 1976); *St. Paul Fire & Marine Ins. Co. v. Asbury*, 149 Ariz. 565, 566 (Ct. App. 1986); *Hirst v. St. Paul Fire & Marine Ins. Co.*, 106 Idaho 792 (Ct. App.

1984); *Niedzielski* v. *St. Paul Fire & Marine Ins. Co.*, 134 N.H. 141, (1991); *Vigue* v. *John E. Fogarty Memorial Hosp.*, 481 A.2d 1, 3 (R.I. 1984); *Standard Fire Ins. Co.* v. *Blakeslee*, 54 Wash. App. 1, 9 (1989).

The standard recognizes several relevant considerations: (1) that membership in a profession has traditionally been recognized as requiring the possession of special learning acquired through considerable rigorous intellectual training; (2) that physicians and dentists, when rendering patient care, are called upon to use or apply special learning or attainments; (3) that, when there is a complaint of malpractice, attention should focus on the act or service performed rather than the fact that the alleged wrongdoer was a physician or dentist because "the scope of professional services does not include all forms of a medical professional's conduct simply because he or she is a doctor or dentist," *Niedzielski* v. *St. Paul Fire & Marine Ins. Co., supra* at 144; and (4) that, to fall within the insuring language like that used here, there must be a causal relationship between the alleged harm and the complained-of professional act or service, that is, it must be a medical or dental act or service that causes the harm, not an act or service that requires no professional skill. Common sense, of course, will always provide a useful guide in differentiating covered from uncovered cases.[6]

The judge correctly decided here, as matter of law, that the dentist's conduct did not come within the scope of the insuring provision. It is self-evident that his professional services — the cleaning and examination of teeth, the replacement of fillings, the extraction of a tooth, and appropriate follow-up care — did not call for sexual contact between him

---

[6]In *Marx* v. *Hartford Accident & Indem. Co.*, 183 Neb. 12 (1968), for example, an employee of the plaintiff, the insured health care professional, in the process of refilling a hot water sterilizer, mistakenly poured benzene instead of water into the sterilization container. Fumes exploded, causing a fire and extensive damage to the professional's office. He sued to recover for the damage on his malpractice policy. It was held that the act causing the damage was not caused by rendering or failing to render professional services.

and his patient. The dentist's area of professional work involved the patient's teeth, and it is obvious that the patient's dental treatment did not require any of the acts that occurred. The injury asserted as malpractice by the patient was caused by sexual contacts on the dentist's part which were completely unrelated to the professional services rendered.

The case, therefore, differs fundamentally from other cases, relied on by the plaintiffs, which hold that a medical professional's sexual contact with a patient fell within the "professional services" language of a malpractice policy. We comment on those cases.

Most of the cases the plaintiffs rely upon involve psychiatrists and the so-called "transference phenomenon." See *St. Paul Fire & Marine Ins. Co.* v. *Mitchell*, 164 Ga. App. 215 (1982); *Vigilant Ins. Co.* v. *Kambly*, 114 Mich. App. 683 (1982); *L.L.* v. *Medical Protective Co.*, 122 Wis. 2d 455 (Ct. App. 1984). The other case cited by the plaintiffs in support of their expansive view of "professional services" is *St. Paul Fire & Marine Ins. Co.* v. *Asbury*, 149 Ariz. 565 (Ct. App. 1986), which involved a gynecologist's sexual assault of a patient during a vaginal examination.

The cases of psychiatric malpractice each involved a medical professional who mishandled a problem that may often occur during the course of psychiatric care, namely, the "transference phenomenon," in which a patient becomes enamored of his or her therapist. *St. Paul Fire & Marine Ins. Co.* v. *Mitchell, supra* at 218. *Vigilant Ins. Co.* v. *Kambly, supra* at 690. *L.L.* v. *Medical Protective Co., supra* at 460. In these cases, the insured medical professionals failed to treat, or improperly treated, an emotional condition which arose as a predictable stage in the treatment sought by their patients. This "transference," caused by the treatment itself, arguably made the plaintiffs in these cases unusually susceptible to the sexual advances by the psychiatrists. In one case, the psychiatrist actually convinced the patient that a sexual relationship between patient and therapist was a part of the treatment of the patient's emotional problems. *Vigilant Ins. Co.* v. *Kambly, supra* at 689-690. In contrast, there is noth-

ing inherent in the typical relationship between patient and dentist that makes the patient unusually susceptible to accept the sexual advances of the dentist. Moreover, the plaintiffs do not argue (nor could they argue with any cogency) that the patient here believed, or that the dentist ever maintained, that sexual contacts were a part of the patient's prescribed dental treatment. The cases from the mental health area do not support the plaintiffs' position that the sexual activity that occurred here arose "out of the rendering of or failure to render . . . professional services."

The case involving the gynecologist is also clearly inapposite. In that case, the Court of Appeals of Arizona concluded that sexual assaults by a gynecologist during routine gynecological examinations fell within the gynecologist's malpractice insurance policy language of "providing or withholding of professional services." *St. Paul Fire & Marine Ins. Co.* v. *Asbury*, *supra* at 566. However, the court in *Asbury* was careful to distinguish the case before it from those in which "the tortious sexual abuse of the patient was not intertwined with and inseparable from the services provided." *Id.* at 566. As an example of a case in which the court did not find the necessary nexus between the sexual abuse that occurred and the treatment sought, the court cited *Hirst* v. *St. Paul Fire & Marine Ins. Co.*, 106 Idaho 792 (Ct. App. 1984). In *Hirst*, the insured doctor sexually assaulted a patient while treating the patient's injured hand. *Id.* at 794. The court in *Hirst* found that the doctor's actions did not constitute "providing or withholding of professional services," and were not covered by the doctor's malpractice insurance policy, because the plaintiff was not damaged by treatment, but by the commission of an intentional tort by the doctor. *Id.* at 795.

The plaintiffs discuss the distinction between these two cases in their brief, and argue that their case is more similar to the gynecologist's case, because the patient here was afraid of dental treatment and sought the dentist because he was known to be "extremely gentle and caring." Thus, the plaintiffs argue, the sexual abuse was "intertwined" with the special care the patient here sought from the dentist. The

contention is devoid of merit. In this case, as in the case of the treatment of the hand, the treatment sought or needed in no way called for even incidental sexual contact between health care provider and patient. Rather, the patient's injuries resulted directly from the dentist's intentionally tortious conduct. The only connection between the sexual misconduct and the treatment in this case is that the activity occurred in the dentist's office. This connection is obviously too remote from the actual rendering of proper services to fall within the coverage of the malpractice policy.

In analogizing their case to those of psychiatric and gynecological malpractice, the plaintiffs urge, in essence, that we view the question of malpractice coverage solely from the patient's subjective point of view. The plaintiffs argue that the controlling factor in determining whether sexual abuse of a patient by a doctor constitutes an "injury arising out of the rendering of or failure to render . . . professional services" should be the specific circumstances of the patient's choice of a certain doctor, given the patient's unique characteristics. Such an individualized inquiry is both inappropriate in the circumstances and unworkable. The plaintiffs have cited no authority for the proposition that the "victim's expectation" of a particular style of professional relationship should be the crucial factor in determining whether given misconduct is covered by a medical malpractice insurance policy such as the one in this case. We conclude that the nature of the professional services offered by the insured, not the subjective style of treatment sought by the patient, is the relevant concern.

2. The plaintiffs also point to the language in the insuring provision which relates coverage to professional services provided "as a dentist," and states that the latter language "mean[s] the practice of dentistry as defined by the applicable statutes and licensing laws of the jurisdiction in which the insured practices." The plaintiffs also call to our attention that the board, in disciplining the dentist, had concluded that he was guilty of "gross misconduct in the practice of his profession." This determination, the plaintiffs maintain, con-

sidered in light of the language quoted above from the insuring provision, brings the dentist's conduct within the scope of the policy. We disagree.

The policy language relating to the practice of dentistry as defined by "applicable statutes and licensing laws" of Massachusetts represents an effort by the insurers to relate the policy coverage to what the Legislature has defined the practice of dentistry to be. The relevant statute is the first paragraph of G. L. c. 112, § 50 (1990 ed.), set forth below,[7] which, as would be expected, offers no help to the plaintiffs. As also would be expected, there is nothing in the record which indicates that licensing provisions for dentists authorize sexual contact between them and their patients.

Similarly, the language in the board's disciplinary decision ("gross misconduct in the practice of his profession") is simply a statement of the statutory ground, of the several set forth in G. L. c. 112, § 61 (1990 ed.),[8] determined by the

---

[7]"A person shall be deemed to be practicing dentistry if he holds himself out as being able to diagnose, treat, operate or prescribe for any disease, pain, injury, deficiency, deformity or other condition of the human teeth, alveolar process, gums or jaws, and associated parts, intraorally or extraorally, or if he either offers or undertakes by any method to diagnose, treat, operate or prescribe for any disease, pain, injury, deficiency, deformity or other condition of the same; of if he, except on the written prescription of a registered dentist and by the use of impressions made by a registered dentist, directly or indirectly by mail, carrier, personal agent, or by any other method, supplies, constructs, reproduces, relines, repairs, adds or directs the application of any substance, of a durable nature, to dentures, bridges, appliances or other structures to be used and worn as substitutes for natural teeth or solicits or advertises, except as permitted in section fifty-two A, to supply, construct, reproduce, repair, reline, add or direct the application of any substance, of a durable nature, to dentures, bridges, appliances or other structures to be used and worn as substitutes for natural teeth; or if he places such substitutes in the mouth or adjusts the same; or, if he, except on the written prescription of a registered dentist, observes a patient's natural dentition for purposes of matching coloration or other aesthetic characteristic to aid in the fabrication or repair of a prescribed restorative appliance."

[8]"Except as otherwise provided by law, each board of registration or examination in the division of registration of the department of civil service and registration, after a hearing, may, by a majority vote of the whole board, suspend, revoke, or cancel any certificate, registration, license or authority issued by it, if it appears to the board that the holder of such

board to be most applicable to the facts of this case. Even assuming that such a determination might constitute admissible evidence, and might have relevance to the interpretation of a contractual insuring provision, see note 4, *supra*, the board's ground of decision provides no basis for concluding that the dentist's conduct was covered by the policy language.[9]

Summary judgment was properly granted for the defendants.

*Judgment affirmed.*

---

certificate, registration, license or authority, is insane, or is guilty of deceit, malpractice, gross misconduct in the practice of his profession, or of any offence against the laws of the commonwealth relating thereto. Any person whose certificate, registration, license or authority is suspended or revoked hereunder shall also be liable to such other punishment as may be provided by law. The said boards may make such rules and regulations as they deem proper for the filing of charges and the conduct of hearings."

[9]The plaintiffs' contention that public policy requires that the policy in issue cover the misconduct is also without merit. The plaintiffs are apparently arguing that public policy requires that malpractice insurance cover improper sexual contact between a dentist and a patient because of the gravity of the harm that occurs, and the fact that the patient may be left uncompensated if no coverage is found. This ignores the central legal question. The insurance policy here is a contract between the dentist and the insurers. The issue is not what coverage is desirable, but rather what coverage does the policy provide in fact and law.