R.W. ET AL., APPELLANTS, V. DANIEL B. SCHREIN, M.D., APPELLEE, AND THE MEDICAL PROTECTIVE COMPANY OF FORT WAYNE, INDIANA, GARNISHEE-APPELLEE.

642 N.W.2d 505

Filed April 19, 2002.   Nos. S-00-808 through S-00-812.

James E. Harris and Britany S. Shotkoski, of Harris, Feldman Law Offices, for appellants.

Mark A. Christensen and Pamela K. Epp, of Cline, Williams, Wright, Johnson & Oldfather, P.C., for garnishee-appellee.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, and MILLER-LERMAN, JJ.

Stephan, J.

As children, the five appellants in these actions were patients of Daniel B. Schrein, M.D., who was then a pediatrician practicing in Omaha. Now adults, appellants brought actions to recover damages for sexual abuse perpetrated upon them by Schrein under the guise of medical treatment. After obtaining default judgments against Schrein, appellants commenced these garnishment proceedings against The Medical Protective Company of Fort Wayne, Indiana (Medical Protective), Schrein's professional liability insurer. The district court for Douglas County determined that the claims were not covered under the policy and entered summary judgment in favor of Medical Protective. Appellants perfected these appeals, which we moved to our docket and decide together in this opinion because the dispositive issues are common to each.

## I. BACKGROUND

This controversy is before us for the second time. In *Medical Protective Co. v. Schrein*, 255 Neb. 24, 582 N.W.2d 286 (1998), Medical Protective sought a declaratory judgment determining that it had no duty to defend or indemnify Schrein with respect to the claims of five former patients that they were sexually abused by Schrein during purported examinations or treatments. The district court entered summary judgment in favor of Medical Protective based upon its determination that Schrein's conduct was not within the scope of professional services as contemplated by the insurance policy. The individual claimants appealed, but Schrein did not cross-appeal. This court held that declaratory judgment with respect to the claimants was improper because the facts pertaining to the issue of coverage had not yet been developed. We noted that the record did not reflect "the specific claims that may be brought against Schrein, e.g., whether the claims involve solely sexual acts or intentional torts, or include other acts or professional negligence." *Id.* at 30, 582 N.W.2d at 291. We further noted that we lacked "the requisite knowledge of what discovery may reveal or, more importantly, what verdict may be rendered by the fact finder." *Id.* We concluded that declaratory relief with respect to the claimants was not necessary because "[a]ny of Medical Protective's defenses or

assertions of noncoverage can be presented without any consequential harm to Medical Protective if or when any of the claimants seeks to garnish policy proceeds as a result of a judgment against Schrein." *Id.* at 31, 582 N.W.2d at 291. However, we determined that because the claimants lacked standing with respect to contractual issues between Medical Protective and Schrein, including the existence of duties to defend or indemnify, our holding did not affect the declaratory judgment rendered in favor of Medical Protective against Schrein.

Appellants herein filed separate actions for professional malpractice against Schrein. Appellant R.W. filed a petition on November 23, 1998, alleging he was Schrein's patient from 1972 to 1990. R.W. alleged that in January 1987, Schrein diagnosed him with and was treating him for recurring meatitis. He alleged that at approximately that time, he developed an antibiotic-induced scrotal infection which Schrein diagnosed as excoriation of the scrotum. R.W. alleged that during an examination, Schrein applied ointment to R.W.'s penis and manipulated it to the point of ejaculation. After commenting about needing to do a sperm count, Schrein forced R.W. to ejaculate again.

Appellant G.N. filed a petition on November 23, 1998. G.N. alleged that he was Schrein's patient from 1986 to 1990. G.N. alleged that from the time he was 11 years old, Schrein would have him sit nude on Schrein's lap while Schrein stroked his body and discussed sexual behavior. G.N. alleged that in 1989, Schrein treated him for meatitis during a physical examination and asked that he return for a followup visit. He alleged that in February 1990, Schrein had him sit on Schrein's lap while he performed a procedure involving insertion of a metal rod into G.N.'s penis.

Appellant C.T. filed a petition on November 23, 1998. C.T. alleged that she was Schrein's patient from 1979 to 1990. She alleged that during the course of examinations, Schrein would have her sit on his lap while nude and would discuss sexual behavior. C.T. alleged that in 1989, while conducting her first pelvic examination, Schrein fondled her breasts, inserted his fingers in her vagina, and manipulated her vulva. C.T. further alleged that before she got dressed, Schrein had her sit on his lap while he

tickled her thighs and asked if she had any boyfriends and if she was sexually active.

Appellant L.N. filed a petition on November 23, 1998. L.N. alleged that during the course of examinations, Schrein would have her sit on his lap nude while he stroked her body and discussed sexual behavior. L.N. also alleged that during examinations, Schrein digitally penetrated her vagina, watched her dress and undress, and made her turn around in front of him when she was nude.

Appellant M.M. filed a petition on October 1, 1998. M.M. alleged that in 1990, when he was 13 years old, he went to Schrein for a routine medical evaluation and treatment concerning the medical condition of being overweight. M.M. alleged that during this visit, Schrein performed a physical examination and diagnosed urinary meatitis. According to the petition, Schrein applied an ointment to M.M.'s penis and manipulated it to the point of ejaculation.

The petitions of all of the above appellants alleged that Schrein knew or should have known that his minor patients were especially vulnerable and readily subject to manipulation and control by their physician. The petitions alleged that this emotional reaction of a patient toward a physician is referred to in the medical community as "transference" and that Schrein had a duty to properly recognize and manage transference as it developed. Each petition alleged that Schrein had a professional, fiduciary, and ethical duty to avoid sexual contact and that his failure to do so fell below the standard of care. Each petition also alleged that Schrein failed to provide proper medical treatment for the conditions presented and performed unnecessary medical examinations and treatments.

Schrein was served by publication in all of the above actions. He failed to answer or appear, and default judgments were entered against him in each case. Each judgment recited that sexual contact with a patient by a fiduciary caused the harm for which damages were sought. The default judgments, which were prepared and submitted by counsel for appellants, also recited that "the acts and omissions of Defendant Schrein arose out of his medical treatment of [appellants] during the course and scope of professional services" in violation of the standard of care.

On March 25, 1999, each appellant issued summons in garnishment upon Medical Protective, alleging that he or she believed Medical Protective held property, in the form of a liability policy, belonging to Schrein. In its answers to the garnishment interrogatories, Medical Protective denied that it held property of Schrein and alleged that its policy of insurance issued to Schrein did not cover payment of damages which were not based upon professional services and that any coverage was further excluded because damages incurred by appellants were the result of criminal, willful, or sexual acts. Appellants each filed applications to determine garnishee liability. See Neb. Rev. Stat. § 25-1030 (Reissue 1995). All parties filed motions for summary judgment. In orders dated July 28, 2000, the district court granted Medical Protective's motions for summary judgment in all five garnishment proceedings. Appellants filed timely appeals, and we granted their respective motions to bypass. The cases were consolidated for oral argument.

## II. ASSIGNMENTS OF ERROR

Each appellant assigns, restated, summarized, and consolidated, that the district court erred in (1) allowing Medical Protective to collaterally attack the underlying judgments against Schrein; (2) determining that Medical Protective had a right to assert policy defenses against Schrein in the garnishment proceedings; (3) determining that appellants' claims did not arise from the rendering of "professional services" by Schrein and were therefore not covered under the professional liability insurance policy issued by Medical Protective; (4) determining that there was no coverage under the policy for the additional reason that the claims against Schrein fell within specific coverage exclusions for criminal, willful, or sexual acts; and (5) determining that public policy did not compel that Schrein's victims be compensated.

In addition, R.W. further assigns that the district court erred in (1) finding that his claim against Schrein was barred by the statute of limitations, (2) failing to find that Neb. Rev. Stat. § 25-21,156 (Reissue 1995) was applicable and that his petition was timely filed pursuant thereto, (3) failing to find that his petition and malpractice suit against Schrein relate back to the filing of the

declaratory judgment, and (4) failing to apply the doctrine of judicial estoppel against Medical Protective as it relates to the statute of limitations.

## III. STANDARD OF REVIEW

Summary judgment is proper when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Ohio Cas. Ins. Co. v. Carman Cartage Co.*, 262 Neb. 930, 636 N.W.2d 862 (2001). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id.*

The interpretation of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independently of the determination made by the lower court. *Tighe v. Combined Ins. Co. of America*, 261 Neb. 993, 628 N.W.2d 670 (2001); *Olsen v. Farm Bureau Ins. Co.*, 259 Neb. 329, 609 N.W.2d 664 (2000).

## IV. ANALYSIS

### 1. PRELIMINARY ISSUES

#### (a) Collateral Estoppel and Res Judicata

Appellants argue that under principles of collateral estoppel and res judicata, the issue of whether Schrein was engaged in the rendition of professional services at the time the damages were incurred has been conclusively established by the findings in the default judgments that Schrein's acts arose out of medical treatment during the course and scope of providing professional service in violation of the standard of care and therefore cannot be raised in the garnishment proceedings. Four conditions must exist for the doctrine of collateral estoppel to apply: (1) the identical issue was decided in a prior action, (2) there was a judgment on the merits which was final, (3) the party against whom the rule is applied was a party or in privity with a party to the prior action, and (4) there was an opportunity to fully and fairly litigate the

issue in the prior action. *Torrison v. Overman,* 250 Neb. 164, 549 N.W.2d 124 (1996). Similarly, the doctrine of res judicata applies to bar relitigation of a matter that has been directly addressed or necessarily included in a former adjudication if (1) the former judgment was rendered by a court of competent jurisdiction, (2) the former judgment was a final judgment, (3) the former judgment was on the merits, and (4) the same parties or their privies were involved in both actions. *Baltensperger v. United States Dept. of Ag.,* 250 Neb. 216, 548 N.W.2d 733 (1996). Both doctrines require an identity or privity of parties.

The only parties to these actions at the time the default judgments were entered were appellants and Schrein. Medical Protective received no notice of the filing of the actions until the commencement of garnishment proceedings. In order for the doctrines of collateral estoppel or res judicata to apply, it must be shown that Medical Protective was in privity with the parties. In the previous appeal, *Medical Protective Co. v. Schrein,* 255 Neb. 24, 582 N.W.2d 286 (1998), we held that because the claimants, who are now appellants in the instant cases, lacked standing with respect to contractual issues between Medical Protective and Schrein, our holding did not affect the declaratory judgment entered in favor of Medical Protective against Schrein which determined that there was no duty to defend. In *Torrison,* 250 Neb. at 176, 549 N.W.2d at 132, we noted that " ' "[p]rivity requires, at a minimum, a substantial identity between the issues in controversy and [a] showing [that] the parties in the two actions are really and substantially in interest the same." ' " (Quoting *VanDeWalle v. Albion Nat. Bank,* 243 Neb. 496, 500 N.W.2d 566 (1993).) We concluded that no privity existed between an insurer and an insured where there was no duty to defend the claim which was the subject of the action. Here, because Medical Protective was not in privity with any party to these actions at the time the default judgments were entered, the doctrines of collateral estoppel and res judicata do not foreclose consideration of whether the claims arose out of "professional services" for purposes of determining garnishee liability.

### (b) Proper Defenses of Garnishee

Appellants also argue generally that as a garnishee, Medical Protective is precluded from attacking any aspect of the

underlying default judgments sought to be enforced in the garnishment proceedings. In response, Medical Protective argues that it is entitled to raise any defense in this garnishment action that it could have raised in the underlying malpractice actions.

In *Medical Protective v. Schrein*, 255 Neb. 24, 31, 582 N.W.2d 286, 291 (1998), we held that declaratory relief with respect to whether specific claims were covered under the professional liability policy was unnecessary, in part because "[a]ny of Medical Protective's defenses or assertions of noncoverage can be presented without any consequential harm to Medical Protective if or when any of the claimants seeks to garnish policy proceeds as a result of a judgment against Schrein." We reaffirm that holding here.

In the instant case, Medical Protective relies primarily upon three policy defenses it could have raised against Schrein and thus may properly raise in the garnishment proceedings. First, Medical Protective argues that because the policy required that Schrein give it notice of actions filed against him and he failed to do so, a condition precedent to coverage under the policy was not met. Second, Medical Protective argues that Schrein's actions were not "professional services" covered under the policy. Third, Medical Protective argues that the exclusionary clauses of the policy for criminal or sexual acts negate any coverage under the policy. We limit our discussion to the second issue, which is dispositive of these appeals.

## 2. RENDERING OF "PROFESSIONAL SERVICES"

The applicable language of the insurance policy issued to Schrein provides that Medical Protective will pay damages "based on professional services rendered or which should have been rendered . . . by the insured or any other person for whose acts or omissions the insured is legally responsible, in the practice of the insured's profession." An insurance contract is to be construed as any other contract to give effect to the parties' intentions at the time the contract was made. *Farmers Union Co-op Ins. Co. v. Allied Prop. & Cas.*, 253 Neb. 177, 569 N.W.2d 436 (1997). When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. *Cincinnati Ins. Co. v. Becker Warehouse, Inc.*,

262 Neb. 746, 635 N.W.2d 112 (2001). While an ambiguous insurance policy will be construed in favor of the insured, ambiguity will not be read into policy language which is plain and unambiguous in order to construe against the preparer of the contract. *Tighe v. Combined Ins. Co. of America*, 261 Neb. 993, 628 N.W.2d 670 (2001). We conclude that the language of the insuring agreement is unambiguous. The question, then, is whether Schrein's actionable conduct constituted "professional services."

In two prior cases, this court has addressed the issue of whether certain conduct constituted "professional services." In *Marx v. Hartford Acc. & Ind. Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968), a physician's employee mistakenly poured benzine instead of water into a sterilization container, resulting in an explosion and a fire. The physician was insured by a policy covering damages arising out of " 'malpractice, error or mistake of the insured, or of a person for whose acts or omissions the insured is legally responsible . . . in rendering or failing to render professional services.' " (Emphasis omitted.) *Id.* at 13, 157 N.W.2d at 871. Noting that the precise question presented was whether the damages arose out of the rendering or failure to render professional services, we stated:

> The insurer's liability is thus limited to the performing or rendering of "professional" acts or services. Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind. The term "professional" in the context used in the policy provision means something more than mere proficiency in the performance of a task and implies intellectual skill as contrasted with that used in an occupation for production or sale of commodities. A "professional" act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. . . . In determining whether a particular act is of a professional nature or a "professional service" we must look not to the title or character of the party performing the act, but to the act itself.

(Citations omitted.) *Id.* at 13-14, 157 N.W.2d at 871-72. Finding that the boiling of water for sterilization was "not a part of any patient's treatment per se any more than any other routine cleaning or arranging procedure incidental to the proper general operations of the plaintiffs' offices," we concluded that the act was not a professional service covered by the language of the insurance policy. *Id.* at 14, 157 N.W.2d at 872.

We recently revisited the *Marx* holding in *Iwanski v. Gomes*, 259 Neb. 632, 640, 611 N.W.2d 607, 613 (2000), which presented the question whether "a doctor commits malpractice by engaging in sexual relations or having consensual sex with an individual with whom the doctor concurrently maintains a physician-patient relationship." After recognizing our holding in *Marx*, we concluded that in order to establish that conduct by a physician constitutes malpractice, the acts of the physician upon which the claim is based must " 'be such as exacts the use or application of special learning or attainments of some kind' " that would constitute the " 'performing or rendering of "professional" acts or services.' " *Iwanski*, 259 Neb. at 641, 611 N.W.2d at 614 (quoting *Marx, supra*). In addressing whether the acts of the physician fell within this definition, we referred to case law from other jurisdictions interpreting "professional services" coverage in insurance contracts. We then stated:

> We agree that the fact that sexual misconduct occurs in a medical professional's office "does not automatically transmute the act into a professional service [because the] location of an act's occurrence is not determinative of liability." *Lindheimer v. St. Paul Fire & Marine Ins.*, 643 So. 2d 636, 638 (Fla. App. 1994). When the only connection between the sexual misconduct and treatment is that the activity occurred in the medical professional's office, such a connection is too remote from the actual rendering of proper services to impose liability upon the medical professional for malpractice. See *Roe v. Federal Ins. Co.*, 412 Mass. 43, 587 N.E.2d 214 (1992).

> We conclude, based on the foregoing rationale, that there must be a causal relationship between the alleged harm and the complained-of professional act or service. When there is

a claim of medical malpractice based on unwanted sexual contact, the determination of liability should focus not solely on the locale of the alleged harm or the professional status of the actor, but, rather, on the context of the alleged medical service involved in the action. In other words, it is the physician's deviation from the recognized medical standard of care *during the course of treatment* that is the essence of a claim for medical malpractice, and *there must exist a causal relationship between the alleged harm and the complained-of deviation from that standard of care in order for liability to attach.*

(Emphasis in original.) (Emphasis supplied.) *Iwanski*, 259 Neb. at 642, 611 N.W.2d at 614. In applying this standard to the facts, we held that the relationship between the adult parties was consensual and that as to the only incident related to the direct provision of medical services, the evidence established that the sexual act between the patient and the physician took place well after the physician had completed a gynecological examination. We thus held that there was no actionable claim for "professional negligence." *Id.* at 643, 611 N.W.2d at 615.

While the conduct upon which each appellant's claim is based occurred in Schrein's office during what purported to be medical examination and treatment, it is clear from the record that there was no causal connection between any legitimate medical procedure and the harm which appellants suffered. Kevin Cahill, Ph.D., a clinical psychologist who examined four of the appellants, provided affidavits upon which their damage awards were based. Cahill characterized the conduct which caused their psychological injuries as "sexual abuse" and "sexual molestation." William H. Batey, a psychotherapist who examined C.T. and provided the factual basis for her damage award, similarly stated that the injury was "a fairly direct outcome of her sexual molestation experience with her pediatrician." Neither Cahill nor Batey established any causal relationship between the harm experienced by appellants and any professional act or omission on the part of Schrein. Harlan C. Schriner, Jr., M.D., a board-certified pediatrician, stated in affidavits offered by Medical Protective in each of these cases that in his opinion, the actions of Schrein which caused injuries to appellants

amount to no more than intentional sexual abuse. Schrein's actions do not constitute or arise out of professional services and do not constitute professional negligence. The actions could not have been unintentionally or negligently done. I am appalled at the suggestion that such actions could be considered to be a part of professional services rendered by a pediatrician in Nebraska. Although Schrein's actions were immoral and unethical, he did not breach the applicable standard of care.

Appellants offered no evidence to rebut Schriner's opinion that Schrein's actions were unrelated to any professional medical services and did not constitute "professional negligence." They argue that because the abuse occurred in Schrein's office while he was purporting to examine or treat his patients, it necessarily fell within the coverage for "professional services." However, appellants did not establish any harm attributable to any failure to properly diagnose or treat a medical condition. Rather, their injuries and damages flowed solely from the affirmative acts of abuse and molestation committed by Schrein under the guise of medical examination and treatment. While these circumstances make Schrein's conduct all the more reprehensible, they do not transform his acts of abuse into "professional services" for purposes of the professional liability insurance policy. An intent to inflict injury can be inferred as a matter of law in cases of sexual abuse. *State Farm Fire & Cas. Co. v. van Gorder*, 235 Neb. 355, 455 N.W.2d 543 (1990). It is clear from the record that when Schrein chose to sexually abuse his patients, he was no longer providing "professional services." See, e.g., *St. Paul Fire &c. v. Alderman*, 216 Ga. App. 777, 455 S.E.2d 852 (1995) (holding physician's digital penetration and clitoral manipulation of patient during examination for urinary tract infection and leg cyst solely for satisfaction of physician's prurient interests and not "professional services" within meaning of liability insurance policy), and *Lindheimer v. St. Paul Fire & Marine Ins.*, 643 So. 2d 636, 639 (Fla. App. 1994) (holding oral surgeon's sexual assault of anesthetized patient not causally connected to provision of professional services "regardless of the 'pretense of medical care used by the insured to catch his victim unaware' "), cited with approval in *Iwanski v. Gomes*, 259 Neb. 632, 611 N.W.2d 607 (2000).

Appellants refer to Schrein's betrayal of their trust as the "essence of the transference phenomenon." As we noted in *Iwanski*, 259 Neb. at 643, 611 N.W.2d at 615, "[t]ransference has been defined as ' "[t]he process whereby the patient displaces on to the therapist feelings, attitudes and attributes which properly belong to a significant attachment figure of the past, usually a parent, and responds to the therapist accordingly." S. Waldron-Skinner, *A Dictionary of Psychotherapy* 364 (1986).' " (Quoting *St. Paul Fire & Marine Ins. Co. v. Love*, 459 N.W.2d 698 (Minn. 1990).) We further noted that while transference was not confined solely to psychiatric treatment and the mental health profession, it is not a recognized component in the medical treatment of physical conditions. There is no evidence in the record that transference was in any way involved in Schrein's molestation of appellants, and thus, as was true in *Iwanski*, there is no genuine issue with respect to professional negligence in the mishandling of the transference phenomenon.

In their petitions, appellants alleged that in addition to being liable for his own acts, Schrein was vicariously liable for the failure of an office nurse employed by him to report her "suspicious findings" regarding Schrein's actions to authorities. Although this argument was not addressed by the district court or developed in the briefs, appellants' counsel contended at oral argument that this allegation brought the case within the provision of the policy which provided coverage for professional services rendered by "any other person for whose acts or omissions the insured is legally responsible." We disagree. Medical Protective offered evidence that the determination of what constitutes immoral or unethical conduct on the part of a physician is not a topic as to which a nurse receives or needs special training, learning, or attainment, and the claim therefore does not involve "professional services" provided by the nurse. Because this evidence was uncontroverted, there was no genuine issue of material fact as to whether the action or inaction of the nurse for which Schrein was alleged to be vicariously liable constituted "professional services" within the meaning of the policy.

### 3. PUBLIC POLICY

Appellants contend that the district court erred in "finding that public policy did not compel that the innocent children victims

of Dr. Schrein be compensated." The phrasing of this assignment of error misconstrues the issue before us. There is no doubt that appellants are entitled to compensation from Schrein based upon their default judgments. The question in this garnishment proceeding, however, is whether Medical Protective is obligated to provide that compensation on Schrein's behalf under the terms of the professional liability insurance policy it issued to him.

As we have previously stated in this opinion, an insurance policy is a contract. *Ohio Cas. Ins. Co. v. Carman Cartage Co.*, 262 Neb. 930, 636 N.W.2d 862 (2001); *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000). Coverage under an insurance policy or contract is generally understood to consist of two separate and distinct obligations: the duty to defend any suit filed against the insured party and the duty to pay, on behalf of the insured, sums for which the insured shall become legally obligated to pay because of injury caused to a third party by acts of the insured. *Farm Bureau Ins. Co. v. Witte*, 256 Neb. 919, 594 N.W.2d 574 (1999). Parties to an insurance contract may contract for any lawful coverage, and the insurer may limit its liability and impose restrictions and conditions upon its obligation under the contract not inconsistent with public policy or statute. *Hood v. AAA Motor Club Ins. Assn.*, 259 Neb. 63, 607 N.W.2d 814 (2000). In this case, the parties to the contract of insurance are Medical Protective and Schrein. Therefore, the precise legal issue presented by this assignment of error is whether a professional liability insurance policy contravenes public policy when it does not include a duty to pay a physician's liability to a patient whom he sexually abused.

Appellants cite the Nebraska Hospital-Medical Liability Act as the source of public policy supporting their entitlement to compensation. See Neb. Rev. Stat. §§ 44-2801 to 44-2855 (Reissue 1998 & Cum. Supp. 2000). They argue that because Schrein was qualified under the act, which requires that he submit proof of liability insurance, the act provides their exclusive remedy against him. Appellants therefore contend that a determination that the policy did not provide coverage for their claims denies them of "legislatively mandated" insurance coverage.

Section 44-2801(2) states that the intent of the act is "to serve the public interest by providing an alternative method for

determining malpractice claims in order to improve the availability of medical care, to improve its quality and to reduce the cost thereof, and to [e]nsure the availability of malpractice insurance coverage at reasonable rates." The act specifically defines "[m]alpractice or professional negligence" to mean a failure to meet certain specified standards "in rendering professional services." § 44-2810. As we have noted, the conduct upon which Schrein's liability to appellants is based was not the rendering of professional services, but, rather, sexual abuse. The Nebraska Hospital-Medical Liability Act makes no reference to such conduct and therefore cannot be regarded as establishing a public policy requiring that a professional liability insurance policy must provide coverage for sexual abuse inflicted by a physician upon his patient. The fact that Schrein's coverage is limited to liability incurred in the performance of professional services is not inconsistent with the purpose or language of the act. See *N.M. Physicians Mut. Liability v. LaMure*, 116 N.M. 92, 860 P.2d 734 (1993) (holding insurance policy which did not provide coverage for physician's sexual assault of patient not inconsistent with state's Medical Malpractice Act).

Other courts have rejected arguments that professional liability insurance policies should be construed to provide coverage under circumstances similar to those before us based upon a public policy favoring compensation of victims. In *Roe v. Federal Ins. Co.*, 412 Mass. 43, 54 n.9, 587 N.E. 2d 214, 220 n.9 (1992), the court noted that the dispositive issue was "not what coverage is desirable, but rather what coverage does the policy provide in fact and law." Another court noted that a policy which did not provide coverage for a physician's sexual misconduct with a patient was not inconsistent with public policy which prohibited the acts in question and invalidated contracts indemnifying a person against loss from willful wrongdoing. *Chicago Ins. Co. v. Manterola*, 191 Ariz. 344, 955 P.2d 982 (Ariz. App. 1998). Similarly, in *N.M. Physicians Mut. Liability*, 116 N.M. at 100, 860 P.2d at 742, the court rejected a claim that coverage for "professional services" should be held to exist on public policy grounds in a case involving a sexual assault on a child by a physician, stating: "Despite our sympathy for LaMure's victim,

denying LaMure indemnification supports the public policy of preventing an insured from being shielded from the negative consequences of his crimes, and of enforcing fair private contracts as written absent conflicting statutorily expressed public policy." See, also, *Austin v. State Farm Mut. Auto Ins. Co.*, 261 Neb. 697, 625 N.W.2d 213 (2001) (holding it is against public policy to insure against liability for one's own intentional acts). We likewise conclude that despite our sympathy for appellants in these cases, there is no clearly articulated public policy which would permit or require us to disregard the unambiguous coverage provisions of Schrein's insurance policy and the fact that his acts did not fall within the coverage provided.

## V. CONCLUSION

For the reasons discussed, we conclude that Medical Protective was entitled to summary judgment in its favor because Schrein's liability to appellants was not based on the provision or failure to provide professional services, and therefore, no coverage existed under the professional liability insurance policy which Medical Protective issued to Schrein. Having made this determination, we need not and do not reach the issue of whether any policy exclusion applies or whether R.W.'s claim was barred by the statute of limitations. The judgments of the district court are affirmed.

AFFIRMED.

WRIGHT and MCCORMACK, JJ., not participating.