MacLeod, J.
This controversy arises out of a contract between the plaintiff, Coral Systems, Inc. (Coral), and the defendant, Lucent Technologies, Inc. (Lucent), granting Lucent the right to distribute fraud detection software manufactured and licensed by Coral in exchange for Lucent’s payment to Coral of certain fees. Coral brought this action claiming that Lucent failed to pay $8,141,800 in fees owed under the contract. Before the court are the parties’ cross motions for summary judgment and Lucent’s motion to strike an exhibit which Coral asserts is a true copy of the parties’ agreement. For the following reasons, Lucent’s motion to strike is ALLOWED and the parties’ cross motions for summary judgment are DENIED.

BACKGROUND

The summary judgment record reveals the following undisputed facts.
Coral manufactures and licenses software for use in the telecommunications industry. One of Coral’s products, the FraudBuster, is a software application that enables wireless carriers to identify and protect against fraudulent transactions.
In early 1996, Sprint PCS (Sprint) asked Lucent to be a distribution channel through which Sprint could purchase the right to use (RTU) FraudBuster with its wireless subscribers. After discussions between Lu-cent and Coral, on June 4, 1996, Lucent sent a letter to Coral to confirm that Coral would provide delivery, implementation, and support of the FraudBuster product to Sprint. The letter reads in relevant part:
[Lucent] hereby requests, from [Coral], the following software and hardware:
FraudBuster 4.0 RTU for up to 1,500,000 subscribers . . . $1,762,500; Maintenance for
FraudBuster 4.0, 7x 24 . . . $470,000.
These same prices for the right to use FraudBuster (by sublicensing it to Sprint) and its maintenance reappear in correspondence exchanged between Coral and Lucent on June 12, 1996, and June 20, 1996.[1]
On June 28, 1996, Lucent sent Coral a purchase order for the right to use FraudBuster for up to 1,500,000 subscribers, for shipment to Sprint, plus maintenance for FraudBuster. Neither the purchase order nor the parties’ written communications in June of 1996 stated what fees Lucent would owe Coral if the number of subscribers exceeded 1,500,000.
On July 31, 1996, Coral sent Lucent an invoice for “FraudBuster 4.0 RTU for up to 1,500,000 Subscribers, $1,762,500.” Lucent timely paid this initial invoice for FraudBuster.
On September 30, 1996, Coral and Lucent executed a Software Acceptance and Distribution Agreement (the original agreement) granting Lucent the right to distribute FraudBuster to Sprint. The original agreement required that its terms be construed as one instrument with the purchase order. Exhibit B to the original agreement lists the percentages of discounts off of Coral’s prices corresponding to three ranges of “Cumulative Application Sales Volumes” and further reads:
Additional subscriber growth will be priced to Lu-cent at 75% of the then applicable per subscriber pricing. LUCENT shall conduct an annual audit of each installation and shall pay the applicable license fee for each net additional subscriber of LUCENT’S customer during the year.
The summary judgment record does not contain any verified or otherwise admissible evidence of the existence of a per subscriber price list applicable to the original agreement.
On June 9, 1997, Coral and Lucent entered into an Amended and Restated Software Acceptance and Distribution Agreement (the amended agreement) which, by its terms, superseded and terminated the original contract. By the terms of the amended agreement, Coral granted to Lucent for a three-year period a “non-exclusive world-wide right and license to use, demonstrate, market and distribute copies of’ Fraud-Buster. In exchange for this right, Lucent agreed to pay software license fees and maintenance fees for the first 1,500,000 subscribers. The amended agreement reads as follows:
The terms and conditions of this Agreement shall apply to any transaction by which [Coral] provides product and related services to Lucent pursuant to purchase order (ORDERS) which may be placed by Lucent. Each ORDER shall incorporate by reference the terms of this Agreement, and it is the intent of the parties that this Agreement and the applicable ORDER(S) be construed together as one instrument.
Article 7C of the amended agreement reads in part, “for each copy of a PRODUCT which Lucent orders and receives from [Coral], Lucent shall make payments to [Coral] as specified in Exhibit B.” Exhibit B requires Lucent to:
*137 pay the applicable license fee for each net additional subscriber of LUCENTS customer during the year. [CORAL] shall invoice LUCENT for the increase in net subscribers within ten (10) days after the anniversary date of the sublicense agreement with each customer. [CORAL] shall keep accurate and complete records of the net subscriber additions. LU-CENT shall be permitted, at its expense, to conduct an annual audit of those . . . records.
Exhibit B provides that Coral would license FraudB-uster to Lucent at prices discounted from Coral’s list prices, with the amount of the discount increasing with the cumulative application sales volume.[2] Although Exhibit B states that Coral’s list prices are “included as part of this Exhibit” the parties dispute whether or not Coral sent and Lucent received Coral’s list prices at or around the time they executed the amended agreement, and whether Coral and Lucent ever reached an agreement on the list prices.
Article 25 of the amended agreement states that
This Agreement shall incorporate the typed or written provisions on LUCENT’S ORDERS issued pursuant to this Agreement, and except for any existing software licenses, purchase orders, letter agreements . . . between the parties this Agreement as supplemented by such provisions shall constitute the entire agreement between the parties with respect to the subject matter of this Agreement and shall not be modified or rescinded, except by a writing signed by [CORAL] and LUCENT . . . Additional or different terms inserted in this Agreement by either parly, or deletions thereto, whether by alterations, addenda, or otherwise, shall be of no force and effect, unless expressly consented to by the other party in writing . .. The provisions of this Agreement supersede all prior oral and written quotations, communications, agreements and understandings of the parties with respect to the subject matter of this Assignment.
The amended agreement requires that its construction and interpretation be governed by New Jersey law, excluding its choice of law rules. The amended agreement states that it incorporates Exhibits A through E.
In 1998, when Richard Kohn (Kohn) took over the position of Lucent’s relationship manager for Coral,[3] his predecessor informed him that if the number of Sprint subscribers exceeded 1.5 million, Lucent would owe Coral additional money. It was not until May 3, 2000, however, that Coral made its first written demand upon Lucent for the payment of additional subscriber fees and additional maintenance fees (collectively referred to as growth fees).
The parties agreed to extend the amended agreement from June 4, 2000, to December 31, 2000. During the period of the amended agreement, Sprint’s subscribers rose to well over 1.5 million. Sprint’s corporate representative, Donna J. Wendel (Wendel) testified at her deposition that Sprint’s number of nationwide subscribers rose from 1.3 million in June 1998, to 2.59 million nationwide by the end of 1998, to 4 million for the quarter ending June 30, 1999, to 5,723,00 by the end of 1999, to 7.4 million by June 30, 2000, and to over 9.5 million by the end of 2000. Wendel’s figures are based upon data filed by Sprint with the Securities and Exchange Commission (SEC) ,[4] and were verified by Wendel by checking Sprint’s database for each of the relevant periods. Coral asserts that, as a result of the number of subscribers exceeding 1,500,000, Lucent incurred but has not paid $8,141,800 in growth fees.

DISCUSSION

1. Lucent’s Motion to Strike
In support of Coral’s motion for summary judgment, Coral’s counsel submitted an affidavit stating that she attached as Exhibit 11 to her affidavit a true and accurate copy of the amended agreement. The final two pages of Exhibit 11, entitled FraudBuster End User List Pricing, lists rates for up to 1.5 million subscribers in the United States and for international subscribers. These two pages are undated and do not appear in the copy of the amended agreement that was attached to the plaintiffs complaint. Lucent moves to strike Exhibit 11, arguing that the plaintiffs counsel lacks personal knowledge to verify that Exhibit 11 is a true and accurate copy of the amended agreement.
Supporting affidavits must be made on personal knowledge, must set forth such facts as would be admissible in evidence, and must show affirmatively that the affiant is competent to testify as to the matters stated in her affidavit. Mass.R.Civ.P. 56(e). The plaintiffs counsel lacks personal knowledge to testify as to whether Exhibit 11 is a true and accurate copy of the amended agreement, and no competent witness has sworn that Exhibit 11 is a true and accurate copy of the amended agreement. Nor has Coral submitted any admissible testimony or other evidence establishing that the parties intended that the two-page Fraud-Buster End User List Pricing document at the end of Exhibit 11 would form part of the amended agreement, much less that Coral and Lucent ever agreed upon its terms. Consequently, on the present record, the Court cannot consider Exhibit 11 on the cross motions for summary judgment, and both the plaintiffs counsel’s affidavit, insofar as it refers to Exhibit 11, and Exhibit 11 must be struck. See TLT Construction Corp. v. A. Anthony Tappe & Associates, Inc., 48 Mass.App.Ct. 1, 11-12 (1999); Roe v. Federal Ins. Co., 412 Mass. 43, 44-45 n.4 (1992).
2. Summary Judgment Standard
This Court grants summary judgment where there is no genuine issue of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party has the burden of affirmatively demonstrating *138 that a genuine issue of material fact does not exist. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summaiy judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by reference to supporting materials listed in Mass.R.Civ.P. 56(c), unmet by countervailing materials, that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Although the supporting materials need not negate an essential element of the claim at issue, they must demonstrate that proof of that element at trial is unlikely to be forthcoming. Id. at 714. A conclusoiy assertion that the nonmoving party has no evidence is insufficient to meet the moving party’s burden. Id. at 715.
Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts demonstrating the existence of a genuine issue of material fact in order to defeat the motion. Pederson, 404 Mass, at 17. The nonmoving party cannot defeat the motion for summary judgment by resting on his or her pleadings and mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).[5]
a) Coral’s Motion for Summaiy Judgment on Liability
Coral seeks entry of summaiy judgment in its favor that Lucent is liable under the amended agreement to pay Coral growth fees, the precise amount to be determined at trial. The crux of the dispute is whether Lucent and Coral agreed upon the payment of growth fees in the event that Sprint’s subscribers exceeded 1.5 million. Coral asserts that for each subscriber over the 1.5 million cap, Lucent agreed to pay Coral $1.13 per subscriber, less certain sliding scale discounts, plus pay annual maintenance fees equal to 20% of the cumulative net additional subscriber fees. Fatal to Coral’s summaiy judgment motion is that it rests upon the price lists contained in Exhibit 11 to the plaintiffs counsel’s affidavit, which has been stricken from the summary judgment record.[6]
b) Lucent’s Motion for Summary Judgment
Lucent also moves for summaiy judgment, arguing that Coral’s invoicing and record-keeping obligations under the contract are conditions precedent to Coral’s right to collect growth fees.
New Jersey case law defines a condition precedent as a Moorestown Management, Inc. v. Moorestown Bookshop, Inc., 249 A.2d 623, 630 (N.J.Super.Ct.Ch.Div. 1969). Where performance of a contract provision is a condition precedent to one party’s recoveiy under the contract, the other party may assert “substantial nonperformance of any condition as a defense to any proceeding against it on the [contract], entirely without regard to whether or not it has been prejudiced by the default.” United National Indemnity Co. v. Sangiuliano, 119 A.2d 35, 37 (N.J.Super.Ct. 1955). Although a contract does not expressly state that compliance with a particular provision is a condition precedent, a provision may nonetheless be a condition precedent if the nature of the agreement or the purpose of the provision at issue supports the conclusion that one party’s liability is expressly conditioned upon the other party’s required conduct. See id. at 39 (insured’s obligation to give insurer timely notice of an accident is condition precedent to insured’s liability under policy, as such notice is necessary for an effective investigation).
fact or event occurring subsequently to the making of a valid contract and which must exist or occur before there is a right to immediate performance, before there is a breach of contract duly or before the usual judicial remedies are available.
Lucent has not established as a matter of law that Coral’s contractual obligations to maintain subscriber records and to invoice Lucent within ten days after the anniversary date of the sublicense agreement are conditions precedent to Coral’s ability to collect growth fees, or that Coral’s conduct amounted to a material breach of the amended agreement. Nowhere does the amended agreement expressly state that such invoicing and bookkeeping duties were conditions precedent, or that Coral would lose its right to collect growth fees by failing to fulfill these two duties. Rather, Article 35 of the amended agreement provides that “No course of dealing or failure of either party to strictly enforce any term, right or condition of this Agreement shall be construed as a waiver of such term, right or condition.”[7]
Lucent contends that Coral’s invoicing and recordkeeping obligations under the amended agreement were intended to give Lucent notice of payment obligations and protect its right to audit Coral’s records. The summaiy judgment materials disclose that in 1998, Lucent’s relationship manager with Coral was aware that Lucent could incur additional growth fees if the number of Sprint subscribers topped 1.5 million. More importantly, Lucent has not shown that it was prejudiced by Coral’s failure to maintain records or to demand payment of growth fees earlier, as Sprint filed SEC forms documenting its number of subscribers between June of 1998 and the end of2000, and where Lucent has not questioned the accuracy of Sprint’s data or argued that Lucent lacked access to this information at any relevant time. Lucent has not on this record demonstrated that Coral’s late claim to growth fees and lack of recordkeeping has deprived it of an important right or benefit under the amended agreement. Contrast United National Indemnity Co. v. Sangiuliano, 119 A.2d at 39-40.

*139
ORDER

For the foregoing reasons it is hereby ORDERED that Lucent’s Motion to Strike is ALLOWED. It is further ORDERED that Coral’s Motion for Summaiy Judgment on Liability is DENIED and that Lucent’s Motion for Summaiy Judgment is DENIED.

On June 12, 1996, Coral sent Lucent a letter specifying Coral’s investment quote to Lucent for Sprint. The figures included in relevant part:
FraudBuster 4.0 RTU for up to 1,500,000 subscnbers $1,762,500
Maintenance for FraudBuster 4.0 (20% of RTU) $470,000.
On June 20, 1996, Lucent sent Coral a letter authorizing Lucent to purchase the right to use the FraudBuster product for Sprint for up to 1,500,000 subscnbers for $1,762,500, plus maintenance for FraudBuster (20% of RTU) for $470,000.

The discount schedule in Exhibit B reads as follows:
Cumulative Application Lucent
Sales Volumes (US$000’s) Discount Level
USS 0-4,000 25% off [Coral] List*
USS 4,001 -7,500 35% off [Coral] List*
$US 7,501 40% off [Coral] List*
*[Coral] List Prtces are included as part of this Exhibit.

In late 1997, Lightbrtdge, Inc. (Lightbrtdge) acquired Coral. For the sake of convenience, however, the Court will refer to Lightbrtdge as Coral.

Sprint filed with the SEC Forms 10-K and 10-Q for the periods ending June 30 and December 31 of the years 1998 through 2000.

Massachusetts’s summaiy judgment standard is in accord with that of New Jersey. See Ball v. The Guardian Life Insurance Co. of America, 666 A.2d 146, 150 (N.J. 1995).

The court notes, however, that Lucent has not moved to strike another version of the two-page document entitled FraudBuster End User List Pricing and bearing the date of June 24, 1997. Brett Powell (Powell), an employee of Coral when it executed the amended agreement, testified that the document was in effect at or around June 24, 1997. While this evidence does not entitle Coral to summaiy judgment, it does raise genuine issues of material fact as to whether the parties intended the dated price lists to form part of the amended agreement executed on June 9, 1997.

Lucent misplaces reliance upon two cases which do not set forth New Jersey law and which axe inapposite. The contract here does not clearly identify Coral’s timely invoicing and bookkeeping duties as conditions precedent to its right to receive growth fees. Contrast Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America, 842 P.2d 1067, 1070 (Wyo. 1992) (entering summaiy judgment for defendant where contract provisions unambiguously made plaintiffs billing a condition precedent to defendant’s obligation to pay interest). Nor can this court make findings at summaiy judgment stage on issues such as whether the parties intended the billing and bookkeeping obligations to be conditions precedent, and whether Lucent has a fair opportunity to review and contest the number of subscribers as documented in Sprint’s SEC filings. Compare Roban Realty, Inc. v. Falle, 538 A.2d 242, 245 (Conn.App. 1988) (where landlord did not timely send tax bill to tenants, and contract provided that such invoicing was a condition precedent to tenants’ obligation to pay tax increase, tenants were not liable for tax increase because they could only seek relief from board of tax review within a finite time frame).